UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL GURRIERI, an individual, | ) |
| Plaintiff, | ) |
| vs. | ) No. 15CV1674 W BLM |
| CARMINA DURAN, an individual, | ) |
| ANDRA DONOVAN, an individual, | ) |
| and CINDY MARTEN, an individual, | ) |
| in their individual capacities, | ) |
| Defendants. | ) |
| _____ | ) |

UNDER SEAL PURSUANT TO PROTECTIVE ORDER

DEPOSITION OF CARMINA DURAN

(PAGES 1 - 241, INCLUSIVE)

August 17, 2016

Reported by:  Antonia Sueoka, CSR No. 9007, RPR





2224 THIRD AVENUE, SAN DIEGO, CALIFORNIA 92101

800.939.0080  619.239.0206  kramm.com
telephone      facsimile        web



DISC CONTAINS:
.txt/ASCII of Transcript ~ PDF of Transcript ~ PDF of Exhibits ~ Condensed Transcript with Word Index

Deposition of Carmina Duran | GURRIERI vs. DURAN, et al.

```
 1                        I N D E X

 2

 3   EXAMINATION                              PAGE

 4   CARMINA DURAN

 5   BY MR. RADI                                6

 6

 7                        EXHIBITS

 8   EXHIBIT      DESCRIPTION                 PAGE

 9   Exhibit 51  Notes, Meeting with Mike, October 6,   108

10               2014; P 00555

11   Exhibit 52  Letter to Michael Gurrieri from   236

12               Acacia Thede, October 24, 2014;

13               P000087

14                        -  -  -

15   PREVIOUSLY MARKED EXHIBITS

16   Exhibit 03

17   Exhibit 10

18   Exhibit 35

19   Exhibit 44

20   Exhibit 46

21   Exhibit 47

22   Exhibit 48

23   Exhibit 49

24   Exhibit 50

25
```

Deposition of Carmina Duran                                        GURRIERI vs. DURAN, et al.

```
 1                           I N D E X

 2

 3                   QUESTIONS NOT ANSWERED

 4                      PAGE   LINE

 5                       221   17

 6                       222   13

 7                   INFORMATION REQUESTED

 8                      PAGE   LINE

 9                       40    11

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Carmina Duran                                    GURRIERI vs. DURAN, et al.

```
 1                         APPEARANCES:

 2

 3    FOR THE PLAINTIFF:

 4    SOKOLOFF STERN, LLP

 5    BY:  MARK A. RADI, ESQUIRE

 6    179 Westbury Avenue

 7    Carle Place, New York  11514

 8    516.334.4500

 9    mradi@sokoloffstern.com

10

11    JANIS LAW GROUP

12    BY:  DEAN T. JANIS, ESQUIRE

13    550 West C Street, Suite 1155

14    San Diego, California  92101

15    619.814.3526

16    dean.janis@janislaw.net

17

18    FOR THE DEFENDANTS:

19    PAUL, PLEVIN, SULLIVAN & CONNAUGHTON, LLP

20    BY:  MICHAEL C. SULLIVAN, ESQUIRE

21    101 West Broadway, Ninth Floor

22    San Diego, California  92101

23    619.237.5200

24    msullivan@paulplevin.com

25
```

```
 1                    APPEARANCES  (CONTINUED)

 2

 3   THE WITNESS:

 4   CARMINA DURAN

 5   (No address provided.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20                         *  *  *  *

21          DEPOSITION OF CARMINA DURAN

22   taken at 101 West Broadway, Ninth Floor, San Diego,

23   California 92101, commencing on Wednesday, August 17,

24   2016, at 10:14 a.m., before Antonia Sueoka, Certified

25   Shorthand Reporter, CSR No. 9007, RPR.
```

Deposition of Carmina Duran                                    GURRIERI vs. DURAN, et al.

```
 1            SAN DIEGO, CALIFORNIA, WEDNESDAY, AUGUST 17, 2016,

 2                            10:14 A.M.

 3                              -  -  -

 4                         CARMINA DURAN,

 5      having been administered an oath, testified as follows:

 6

 7                          EXAMINATION

 8   BY MR. RADI:

 9      Q.    Good morning.

10      A.    Good morning.

11      Q.    My name is Mark Radi.  I represent Michael

12   Gurrieri in this lawsuit.  I'm going to be asking you

13   questions about yourself and about Michael's allegations.

14   I ask that you answer every question truthfully and to

15   the best of your recollection unless directed not to by

16   your attorney.

17            If you don't understand any question I ask you,

18   just let me know.  I'll try to rephrase it so that you

19   can understand it.  And if you answer a question without

20   telling me that you didn't understand it, then I'll

21   assume, then, that you did understand it and your answer

22   was accurate.  Is that okay?

23      A.    Yes.

24      Q.    Make sure all your answers are verbal so that we

25   can get them on the record, and just let me finish my
```

1   question before you give your answer, and I'll also try

2   not to speak over you.  All right?

3        A.   Yes.

4        Q.   If you need a break at any time, it's not a

5   problem as long as there's no question pending.

6        A.   Okay.

7        Q.   Did you take any medication that would affect

8   your ability to testify today?

9        A.   No.

10        Q.   Are you prescribed any medication that you did

11   not take today that would affect your ability to testify?

12        A.   No.

13        Q.   Have you ever been a defendant in a lawsuit

14   before?

15        A.   Yes.

16        Q.   When was that?

17        A.   Approximate --

18        Q.   Withdrawn.

19             How many times, besides this case?

20        A.   Once.

21        Q.   Okay.  When was that?

22        A.   2004/'05, I don't recall exactly.  Over --

23   approximately 10 years ago.

24        Q.   What was the nature of the lawsuit?

25        A.   It was a civil lawsuit when I was working for

1    the City Attorney's Office.

2         Q.   Were you sued as an individual?

3         A.   No.   The -- two other attorneys in the office in

4    that department that I worked for.

5         Q.   You were a named defendant?

6         A.   Yes.

7         Q.   What was the nature of the claim against you?

8         A.   The claim was a colleague had committed suicide,

9    and the former spouse claimed that the staff at the City

10   Attorney's Office had either prior knowledge or we could

11   have prevented his suicide.

12        Q.   How was the case resolved?

13        A.   It was dismissed.

14        Q.   Did you ever give testimony in that case?

15        A.   No.

16        Q.   And that was the only time you were a defendant,

17   right, besides this case?

18        A.   Yes.

19        Q.   Have you ever been a plaintiff in a lawsuit?

20        A.   Yes.

21        Q.   How many times?

22        A.   I don't recall.  Car accidents.

23        Q.   Okay.  All car accidents?

24        A.   Yes.

25        Q.   Did you testify at depositions or trials in any

 1     of those cases?

 2         A.    Depositions.

 3         Q.    Where did you graduate from college?

 4         A.    South -- I've forgotten the name.  Sawyer

 5     College of Business.

 6         Q.    Where is that?

 7         A.    San Diego.

 8         Q.    What was your degree?

 9         A.    Legal studies.

10         Q.    Did you go to any other colleges?

11         A.    Southwestern College and Golden West College.

12         Q.    Anywhere else?

13         A.    No.

14         Q.    Did you obtain any degrees from either of those

15     other two colleges?

16         A.    I obtained a certified -- certification in

17     investigations from Golden West College.

18         Q.    Anything else?

19         A.    No.

20         Q.    Do you have any other certifications or licenses

21     or degrees?

22         A.    I do not.

23         Q.    Do you have any post-college education?

24         A.    I do not.

25         Q.    How long have you been working for the San Diego

1   Unified School District?

2       A.   Since 2007.

3       Q.   What was your first position with the District?

4       A.   Internal investigator.

5       Q.   What department did you work for in the District

6   or office?

7       A.   Office of Audits and Investigations.

8       Q.   Do you remember how many internal investigators

9   worked in that office when you were an internal

10  investigator?

11      A.   Just me.

12      Q.   How long were you internal investigator?

13      A.   Until 2006.  I'm sorry.  Pardon me.  I'm sorry.

14  I got my -- 2011, '12.

15      Q.   Did you report to anybody when you were an

16  internal investigator?

17      A.   Yes.  I reported to Andrea Niehaus.

18      Q.   Who was that?

19      A.   She was the director of Audits/Investigations.

20      Q.   Did you supervise anybody as internal

21  investigator?

22      A.   No.

23      Q.   What were your duties as internal investigator?

24      A.   I was responsible for investigating allegations

25  of employee misconduct and fraud.  I was responsible for

1   the District's fraud hotline, managing it.

2        Q.   Anything else?

3        A.   I was responsible for investigating complaints

4   filed with the fraud hotline.

5        Q.   Anything else?

6        A.   And I assisted, occasionally, the auditors in

7   doing low-level audits.

8        Q.   Anything else?

9        A.   No.

10       Q.   Would you write reports as part of your

11   investigations, or at the conclusion of your

12   investigations?

13       A.   Yes.

14       Q.   Would you submit those reports to your

15   supervisor for review?

16       A.   Yes.

17       Q.   Would your supervisor ever edit your reports or

18   give you comments?

19       A.   Yes.

20       Q.   Was that common, for your supervisor --

21       A.   No.

22       Q.   -- to give you comments on your reports?

23       A.   She didn't do it often.

24       Q.   Sometimes?

25       A.   Occasionally.

1    Q.   Did you receive any training from your

2    supervisor or anybody else in that office on conducting

3    investigations or report writing?

4    A.   Yes.

5    Q.   What type of training did you receive?

6    A.   It was verbal training.  I was the first

7    investigator hired by the District.

8    Q.   What do you mean by "verbal training"?

9    A.   When I was first hired, she sat me in her

10   office, and she discussed the process for conducting

11   internal investigations for the District.  She talked to

12   me about the different protocols, the various policies

13   and procedures that were pertinent to our function, and

14   we talked about the various collective bargaining units,

15   and how their contracts specified how investigations are

16   to be conducted.

17   Q.   Anything else?

18   A.   Not that I recall.

19   Q.   Did that verbal training occur at the beginning

20   of your employment?

21   A.   It was -- pardon me.  It was in the beginning

22   and ongoing, depending on the case.

23   Q.   What was your next position of employment after

24   internal investigator?

25   A.   My position was eliminated.  I don't recall the

```
 1    exact date, but I was picked up, if you want to call it
 2    that, by Human Resources, so I became internal
 3    investigator for Human Resources.
 4         Q.   When you were first hired as internal
 5    investigator in 2007, was that a probationary position to
 6    start out?
 7         A.   Yes.
 8         Q.   And then you became permanent?
 9         A.   Permanent.
10         Q.   Was there any gap in between that position with
11    the Office of Audit/Investigations and the HR office?
12         A.   No.
13         Q.   What were your duties as internal investigator
14    for HR?
15         A.   Primarily conducting investigations of employee
16    misconduct, allegations of sexual harassment and
17    discrimination.  I was responsible for responding to EEOC
18    complaints and Department of Fair Employment and Housing
19    complaints.
20         Q.   Anything else?
21         A.   And any other cases that were assigned by
22    District leadership.
23         Q.   Did you have a supervisor?
24         A.   Yes.
25         Q.   Who was that?
```

1     A.   Lamont Jackson.

2     Q.   What was that person's position?

3     A.   Chief of Human Resources officer.

4     Q.   Did you write reports in that position as

5 internal investigator for HR?

6     A.   Yes.

7     Q.   Would your supervisor ever review your reports

8 and provide comments?

9     A.   I don't know if he reviewed them.  He never

10 provided comments.

11     Q.   Okay.  Did you ever submit your reports to him

12 prior to issuing them?

13     A.   No.

14     Q.   How long were you internal investigator for HR?

15     A.   I believe two years.

16     Q.   Until 2014?

17     A.   No.  I'm sorry.  So it must have been 2010 when

18 I was released from HR -- I mean, from Internal Audit.

19     Q.   So until 2012 in HR?

20     A.   No.  Let me think for a second, please.

21     Q.   Sure.  Take your time.

22     A.   I think it must have been '11.  In 2011.

23     Q.   Which was 2011?

24     A.   The HR.

25     MR. SULLIVAN:  You mean when it started?

1          THE WITNESS:  When it started.

2    BY MR. RADI:

3        Q.   Okay.  Until '13?

4        A.   Until November of 2012.

5        Q.   What was your next job after that?

6        A.   Well, I was in HR.  I was given a promotion.  I

7    was an interim Human Resources officer for approximately

8    five months.

9        Q.   When you were investigator for HR, were there

10   any other investigators?

11       A.   Just me.

12       Q.   Did you supervise anybody?

13       A.   I did not.

14       Q.   What were your duties as interim HR officer?

15       A.   I was providing support to the sites on how to

16   handle employee matters.  I was being trained.  I was

17   handling the return-to-work after workers' comp cases.

18       Q.   Anything else?

19       A.   No, not that I -- not that I recall.

20       Q.   In either of your positions as internal

21   investigator, either for HR or Audit, did you ever

22   conduct investigations that involved students,

23   student-on-student sexual abuse or harassment or assault,

24   or anything similar to that?

25       A.   No.

1     Q.    What was your next position after interim HR

2  officer?

3     A.    I was appointed as executive director of the

4  Quality Assurance Office.

5     Q.    When was that?

6     A.    Fall of 2012.  '13.  I'm sorry.  2013.

7     Q.    Who appointed you executive director?

8     A.    The Board of Education.

9     Q.    Do you know who was the superintendent at the

10  time that you were appointed?

11     A.    Cindy Marten.

12     Q.    Do you know whether she had any input into your

13  appointment?

14     A.    I believe she did.

15     Q.    What is your basis for that belief?

16     A.    She talked to me about her vision about the

17  Quality Assurance Office.

18     Q.    Did she tell you that she wanted to recommend

19  you for the position?

20     A.    Yes.

21     Q.    What was her vision for the Quality Assurance

22  Office that she discussed with you?

23     A.    She wanted to be a centralized function of one

24  department where all inquiries and concerns and

25  complaints would be filed.  She wanted it to be -- her

```
 1   vision was a one-stop shop.
 2        Q.   And you've been in that position since the fall
 3   of 2013?
 4        A.   Yes.
 5        Q.   When you were interim HR officer, did you
 6   supervise anybody?
 7        A.   I did not.  I need to explain that.  I did not
 8   directly supervise anybody, but I provided guidance on
 9   how to conduct site investigations.
10        Q.   Guidance to who?
11        A.   To site administrators, to other supervisors.
12        Q.   Where did you work prior to your first job with
13   the District?
14        A.   I worked for the San Diego City Attorney's
15   Office.
16        Q.   What was your position there?
17        A.   I was a criminal investigator.
18        Q.   How long did you work there?
19        A.   I worked there five years.
20        Q.   From when to when?
21        A.   2001 to 2000- -- when I was hired by the
22   District, 2007.
23        Q.   Okay.  What were your duties as criminal
24   investigator?
25        A.   I was in the Consumer and Environmental
```

1    Protection unit, and I was responsible for investigating

2    consumer complaints, unfair business practices,

3    unlicensed contractors, et cetera.

4         Q.   Anything else?

5         A.   I provided some support to the environmental

6    investigator and worked in conjunction with the District

7    Attorney's Office in some cases.

8         Q.   Okay.  Anything else that you recall?

9         A.   I was responsible for conducting internal

10   investigations, employee complaints of harassment and

11   discrimination.

12        Q.   Anything else?

13        A.   Not that I recall.

14        Q.   Did you have -- did you supervise any other

15   employees in that position?

16        A.   I did not.

17        Q.   Did you report to anybody?

18        A.   I reported initially to Dave James, who was the

19   chief of the department, and the last person that I

20   reported to is Cindy Davis.

21        Q.   Did you draft reports as part of your

22   investigations?

23        A.   Yes.

24        Q.   Would you provide them to your supervisor for

25   review and comments?

1      A.    Yes.

2      Q.    Would they give you comments and edits on your

3  reports from time to time?

4      A.    Yes.

5      Q.    Where did you work prior to San Diego City

6  Attorney's Office?

7      A.    I worked for the San Diego District Attorney's

8  Office.

9      Q.    From when to when?

10      A.    1988 to 2001.

11      Q.    What was your position there?

12      A.    Supervising investigator.

13      Q.    What were your duties as supervising

14  investigator?

15      A.    I was -- I was in the Public Assistance unit,

16  and I investigated a staff of investigators responsible

17  for conducting welfare fraud investigations.

18      Q.    You supervised the staff?

19      A.    Yes.

20      Q.    How many investigators did you supervise?

21      A.    It varied.   There was rotations as low as five,

22  as high as eleven.

23      Q.    Did you have any other duties?

24      A.    On occasion, I was given some internal

25  investigations; employee misconduct.

1      Q.    Would you also conduct investigations?

2      A.    Yes.

3      Q.    Did you report to anybody?

4      A.    I reported to a number of people.

5      Q.    Did you ever provide any reports that you

6    drafted to anybody that you reported to for their review

7    and comment?

8      A.    Yes.

9      Q.    Would they ever provide you with comments or

10   edits?

11     A.    Comments.

12     Q.    Did the investigators that you supervised

13   provide you with drafts of their reports or writings for

14   your review and comments?

15     A.    Yes.

16     Q.    And would you provide edits for those reports

17   from time to time?

18     A.    Yes.

19     Q.    Was it common for you to provide edits to

20   your -- to the reports of people that you supervised?

21     A.    Edits and feedback, yes.

22     Q.    Was that a normal part of your job?

23     A.    Yes.

24     Q.    Did you work anywhere prior to the San Diego

25   DA's office?

```
 1        A.    Yes.   I worked for the County of San Diego,
 2   Department of Social Services for two years.
 3        Q.    '86 to '88?
 4        A.    '86 to '88.
 5        Q.    What did you do there?
 6        A.    I determined eligibility for public assistance
 7   benefits.
 8        Q.    Anything else?
 9        A.    Maintain a caseload, conducted interviews to
10   determine eligibility for benefits.
11        Q.    Anything else?
12        A.    No.
13        Q.    Did you supervise anyone in that role?
14        A.    I did not.
15        Q.    Did you have a supervisor?
16        A.    Yes.
17        Q.    Did you prepare reports or other writings for
18   your supervisor's review and edits?
19        A.    I do not recall.
20        Q.    Did you work anywhere prior to that?
21        A.    I worked for -- let me think.  It's been so long
22   ago, 30 years.  Let me think for a second.  Okay?
23        Q.    Sure.  Take your time.
24        A.    I worked for the City of Lemon Grove in the
25   Community Development Department from 1984 to 1986, and
```

1    as an administrative assistant.

2         Q.    Anywhere else?

3         A.    Prior to that, I worked for International

4    Laborers Union, Local Number 89.

5         Q.    What did you do there?

6         A.    Administration -- clerical work.

7         Q.    Do you know what years you were there?

8         A.    Two years.  So that would have been '82 to '84.

9         Q.    Anywhere else?

10        A.    I was in high school.

11        Q.    Okay.  You were in high school when you worked

12   there, or before you were in high school?

13        A.    Before that.

14        Q.    Okay.  Why did you leave the San Diego City

15   Attorney's Office?

16        A.    The job with the County -- with the District

17   paid -- it was a higher pay.

18        Q.    Why did you leave the DA's office?

19        A.    At that time, my mother was suffering of cancer.

20        Q.    Sorry.

21        A.    And I had four younger, small children.  And the

22   DA's office did not want to offer me a part-time

23   position.  And the City Attorney's offer -- offered me a

24   part-time -- a six-hour job.  So that was the reason for

25   leaving; flexibility.

1      Q.    Have you ever had any training in Title IX?

2      A.    Some.

3      Q.    Okay.  What type of training have you had?

4      A.    We had the Title IX coordinator come to our

5  office and give us a training.  I've also attended two

6  training sessions that were conducted by a law firm.

7      Q.    When was this training that you're talking

8  about?

9      A.    The law firm, it was last year, and the Title IX

10 coordinator was approximately two, three years ago.

11     Q.    Was the training by the Title IX coordinator

12 after the conclusion of the ██████ investigation?

13     A.    Before.

14     Q.    And the training by the law firm was also

15 before?

16     A.    That was after.

17     Q.    The training by the law firm was when?

18     A.    I don't recall the exact date, but it was last

19 year.

20     Q.    Last year.  Oh, the Title IX coordinator was

21 before, then?

22     A.    Yeah, prior.

23     Q.    Do you recall what the training involved in

24 either -- either case, in those two training sessions?

25     A.    It was a process that needs to be followed when

```
 1    conducting -- or handling these type of cases.  You have
 2    to be trained in conducting -- one of the things that was
 3    stressed was how specialized that area is because
 4    sometimes the incidents are -- or the -- yeah, the
 5    incidents are vague, and sometimes it's hard to determine
 6    whether or not it falls under the criteria of sexual
 7    harassment.
 8        Q.   Anything else that you recall from the training?
 9        A.   I do not.
10        Q.   Have you had any other training in Title IX or
11    sexual harassment?
12        A.   Sexual harassment.
13        Q.   When was that?
14        A.   Every -- pardon me.  Starting with the District
15    Attorney's Office, we had biannual sexual harassment
16    training, and the District also requires sexual
17    harassment training every two years.
18        Q.   Do you recall what the District's sexual
19    harassment training that you attended involves?
20        A.   It involves identifying sexual harassment.  It
21    involves the responsibilities of a supervisor to put a
22    stop and the steps that need to be taking -- taken
23    afterwards.
24        Q.   Anything else?
25        A.   Not that I recall.
```

1    Q.    Did that sexual harassment training involve

2    incidents involving students?

3    A.    No.

4    Q.    It was just about employee sexual harassment?

5    A.    Yes.

6    Q.    Prior to becoming executive director of Quality

7    Assurance, had you ever conducted any investigations

8    involving sexual assault or harassment or abuse amongst

9    children?

10   A.    No.

11   Q.    Based on your employment experience, I assume

12   that you've conducted a lot of investigations in your

13   career; is that correct?

14   A.    That is correct.

15   Q.    Okay.  And would you ever -- at any time in your

16   career, did you ever write out questions to bring to your

17   interviews?

18   A.    No.

19   Q.    No?

20   A.    Never.

21   Q.    Did you ever have notes or outlines to bring to

22   your interviews?

23   A.    I had outlines -- I've had outlines, yes.

24   Q.    And you would use those during your interviews?

25   A.    Rarely.

1      Q.   Sometimes?

2      A.   Rarely.

3      Q.   So sometimes, or -- not never, right?

4           MR. SULLIVAN:  Objection.  Asked and answered.

5  BY MR. RADI:

6      Q.   Not never?

7      A.   Rarely.  I don't want to limit myself.  I think

8  you limit yourself when you bring a script of questions.

9      Q.   You limit yourself if you have notes or

10 outlines?

11     A.   Pardon me?

12     Q.   You limit yourself if you have notes or

13 outlines?

14     A.   I think so.  I don't want to be distracted.

15     Q.   Do you think it's good to have questions or

16 notes to provide you a starting point?

17     A.   Depending on the case.

18     Q.   So sometimes it could be a good thing?

19     A.   Depending, yes.

20     Q.   Okay.  Prior to -- withdrawn.

21          So you said that you received training when you

22 were -- when you first became an internal investigator in

23 how to deal with represented employees --

24     A.   Uh-huh, yes.

25     Q.   -- correct?

Deposition of Carmina Duran                                    GURRIERI vs. DURAN, et al.

```
 1              Did you ever learn during the course of that
 2    training whether or not the investigator's notes or
 3    questions have to be provided to the representative?
 4        A.    No.
 5        Q.    Did that ever come up in one of your interviews
 6    when you were internal investigator?
 7        A.    No.  But I do recall specifically that your
 8    report and notes are discoverable.
 9        Q.    What do you mean by "discoverable"?  Do you mean
10    in a lawsuit or by the public?
11        A.    In an administrative hearing, because we deal
12    with administrative hearings, the employee, if it's been
13    recommended that corrective or disciplinary action be
14    taken, that they're entitled to due process, and due
15    process includes their right to our work product.
16              MR. SULLIVAN:  It was beeping yesterday.
17              MR. JANIS:  Last two days, yeah.  I figured you
18    had someone listening in on it.
19              MR. SULLIVAN:  Yeah, no.
20    BY MR. RADI:
21        Q.    Do you know when -- do you remember when the
22    Quality Assurance Office was formed?
23        A.    It was officially opened in September of 2014.
24        Q.    September of 2014?
25        A.    Yes.
```

1     Q.   What do you mean, "officially opened"?

2     A.   We had an open house.  We were actually fully

3   established.  We were operating initially from different

4   places.  We didn't have a location.  We were building

5   that annex specifically for our offices.

6     Q.   So you mean the building itself was officially

7   opened in September 2014?

8     A.   Officially opened, yes.

9     Q.   And when did the -- when did your department

10  start functioning?

11    A.   November of 2013.  And we moved to the annex

12  April of 2014.

13    Q.   Can you describe the process for when the

14  District receives a complaint that is forwarded to your

15  office?

16    A.   The complaint is filed in our office, and

17  depending on the -- there's numerous complaints that can

18  be filed.  Our office primarily handles the citizen

19  complaints against an employee, and those are filed

20  pursuant to Administrative Procedure 9430.

21         The complaint is filed, and the process that we

22  had back then is that my operations specialist would

23  gather background information, had a PSL, Parent Support

24  Liaison, had been working on it, attaching notes, and

25  then the case would be given to me for review.

1        My job is to determine whether the case would be

2   accepted, whether it falls under the purview of the

3   Quality Assurance Office; if it didn't, refer to the

4   appropriate person or department.  And if assigned, if

5   we're going to keep it, then assign it to, at that time,

6   a investigator.

7        Q.   Okay.  How would you determine if a complaint is

8   assigned to an investigator as opposed to other people in

9   the office?  Are there other positions in the office?

10       A.   No, I meant to another department.

11       Q.   Okay.  But were there other positions in the

12  Quality Assurance Office besides investigator?

13       A.   Yes.

14       Q.   What positions were those?

15       A.   They were the Parent Support Liaisons, and an

16  operations specialist, and a clerk, administrative

17  support staff.

18       Q.   Would complaints be assigned to Parent Support

19  Liaisons to handle?

20       A.   Formal complaints?

21       Q.   Any -- I don't know.  Any complaint.

22       A.   Initial complaints, yes, but not a formal

23  complaint.

24       Q.   Formal complaints are to the investigator?

25       A.   Yes.

1      Q.    And Parent Support Liaisons handled informal
2    complaints?
3      A.    Yes.
4      Q.    Do informal complaints ever get forwarded to an
5    investigator?
6      A.    Through me.
7      Q.    How does that work?
8      A.    If the parent -- if the parent, usually parents,
9    are not satisfied with the resolution at that level and
10   they want to pursue it, then they have the -- depending
11   on what the nature of the complaint is, they can either
12   file a formal complaint or they can make -- write a
13   letter, or they can request via email.
14     Q.    Does the Quality Assurance Office have a set
15   protocol or procedure for the investigation of
16   complaints?
17     A.    Yes.
18     Q.    When was that protocol or procedure implemented?
19     A.    I don't recall the exact date, but it was
20   shortly after we were in place.
21     Q.    What do you mean by "in place"?  When the office
22   started functioning or when it moved to the building,
23   or --
24     A.    I don't recall --
25     Q.    -- when it opened?

```
 1        A.   -- the exact date, but I think it was after we
 2   moved to the building.
 3        Q.   That was April 2014, when you moved to the
 4   building?
 5        A.   Yes.
 6             MR. SULLIVAN:  2013, I thought you said?
 7             THE WITNESS:  2013 -- no.  It was 2014.  It was
 8   2014.
 9             MR. SULLIVAN:  It was 2014?
10             THE WITNESS:  Yeah, it was 2014.
11   BY MR. RADI:
12        Q.   You don't know how long after that that you
13   implemented the protocol?
14        A.   I don't recall.
15        Q.   Do you know who created the protocol or
16   procedure for investigation of complaints?
17        A.   Can you repeat the question?
18        Q.   Do you know who created the protocol or the
19   procedure for the investigation of complaints?
20        A.   I did.
21        Q.   Did you corroborate with anybody else on the
22   creation of that protocol?
23        A.   I did not.  But it was vetted by District
24   leadership and the various labor groups.
25        Q.   What do you been by "District leadership"?
```

1      A.    By Legal Services, the chief of staff.

2      Q.    Who is the chief of staff, or who was when --

3      A.    Stacy Monreal.

4      Q.    Anyone else?

5      A.    Cindy Marten.

6      Q.    Anyone else?

7      A.    Our executive director of Labor Relations, that

8  I know of.  There may be other people, but I'm not aware.

9      Q.    Was it adopted by the Board then?

10      A.    I don't know.

11      Q.    Do you know who from Legal vetted your protocol

12  or procedure?

13      A.    I do not.

14      Q.    Do you know if Andra Donovan was involved?

15      A.    I don't know.

16      Q.    What is this called?  Was it a protocol or

17  procedure, or something else?

18      A.    It's called "Quality Assurance Office Protocol."

19  And it pertains to the function of the office, not

20  specific to just investigations.

21      Q.    Does it outline a procedure for how to conduct

22  investigations, or how investigations should be

23  conducted?

24      A.    An outline, yes; a summary.

25      Q.    What does it say about how to conduct

1    investigations?

2        A.   It talks about the process -- our internal

3    process for handling complaints.

4        Q.   What does it say about that?

5        A.   What I said earlier, how they're handled and how

6    they're assigned, and if they're assigned, what the

7    investigator will do.

8        Q.   What does it say about what the investigator

9    will do?

10       A.   Contact the parties involved, the corres- -- in

11   some cases, it would be a letter, and I also provide a

12   sample of the letter.

13       Q.   What else?

14       A.   It talks about how -- talks about the rights,

15   the employee's rights.

16       Q.   The employee conducting the investigation, or

17   the employee being investigated?

18       A.   The subject and the respondent.

19       Q.   Okay.

20       A.   And we talk about Lybarger, which is like

21   Miranda for cases that may be potential for criminal

22   actions.  It talks about producing a report, and a

23   notification to the complainant of the findings of the

24   investigation to the extent permitted by law.

25       Q.   Does it discuss how to draft the report or what

 1   should be contained in the report?

 2       A.   It's a summary.

 3       Q.   What does it say?

 4       A.   I don't recall exactly the words.  I'm sorry.

 5       Q.   Do you recall generally what it says?

 6       A.   I do not.

 7       Q.   You said it discusses producing the reports to

 8   the complainant?

 9       A.   No.  The findings of the investigation.

10       Q.   Findings?

11       A.   Yes.

12       Q.   Does it discuss producing actual reports?

13       A.   No.

14       Q.   Do you recall anything else that is contained in

15   the Quality Assurance Office Protocol?

16       A.   Not at this time.

17            MR. RADI:  Do you have your exhibits?

18            MR. SULLIVAN:  Uh-huh.

19   BY MR. RADI:

20       Q.   Take a look at Exhibit 3 from plaintiff's

21   deposition.  Can you review it and let me know when

22   you're done?

23            MR. SULLIVAN:  I'll look on with you.

24            MR. RADI:  Between you and me, I just got an

25   email confirming tomorrow.  I don't know if it's you; so

1    we're on.

2                MR. SULLIVAN:   Go ahead.

3                THE WITNESS:   Okay.

4    BY MR. RADI:

5        Q.    Finished with your review?

6        A.    Uh-huh.   Yes.

7        Q.    Okay.   Is Exhibit 3, is this the protocol that

8    we were discussing that you created?

9        A.    Yes.

10       Q.    Do you recall when Mike Gurrieri was hired?

11       A.    April 2014.

12       Q.    Do you recall if this protocol was in place at

13   the time he was hired?

14       A.    I recall providing him a copy of the protocol,

15   yes.

16       Q.    Did you provide him a copy of the finished

17   protocol, or --

18       A.    Yes --

19       Q.    -- a draft?

20       A.    -- finished.

21       Q.    Do you remember when you provided it to him?

22       A.    He was -- when he was first hired.

23       Q.    Is that a different date from when he started?

24   Hiring date and start date, are they the same, or

25   different in this case?

      

1      A.    They're the same.

2      Q.    So on the day you hired him, you gave him

3  this --

4      A.    Not on the day he was hired.  That's different.

5  When he was first hired.

6      Q.    I'm confused.  What do you mean by when he was

7  first hired and the day he was hired?

8      A.    The day that he started, on that first day, I

9  don't recall giving it to him on the first day, but I

10  recall giving it to him early on.

11      Q.    Okay.  So sometime after he started working?

12      A.    Yes.

13      Q.    You're not sure how long after?

14      A.    I do not.

15      Q.    Do you recall if this protocol was in place

16  prior to him being hired?

17      A.    I do not.

18      Q.    Did he ever give you any input on this protocol,

19  on drafting it, or --

20      A.    No, he did not.

21      Q.    Do you recall working on a draft of the protocol

22  at the time when Mr. Gurrieri was employed?

23      A.    I don't recall.

24      Q.    Do you recall one way or the other if you were

25  drafting the protocol at the time he was employed?

1      A.   I believe the protocol was completed.

2      Q.   Do you have a supervisor that you report to?

3      A.   I do.

4      Q.   Who is that?

5      A.   Andra Donovan.

6      Q.   Anyone else?

7      A.   Andra Donovan is the only one.

8      Q.   Do you remember when Mike Gurrieri was employed

9  at your office, from when to when?

10     A.   April 2014 to October 2014.

11     Q.   Were there any other investigators employed

12  during that time period, in your office?

13     A.   No.

14     Q.   How many other employees were in your office

15  during that time?

16     A.   Five Parent Support Liaisons.

17     Q.   Anyone else?

18     A.   The operations specialist.

19     Q.   Who is that?

20     A.   Samantha Clabaugh.

21     Q.   Anyone else?

22     A.   And the administrative assistant.

23     Q.   Who was that?

24     A.   Connie, and her last name is Perez, P-e-r-e-z.

25     Q.   Anyone else?

1       A.    Myself, Mike -- Michael Gurrieri, and myself.

2       Q.    That's it?

3       A.    At that time, yes.

4       Q.    Were there any internal investigators prior to

5    hiring Mike Gurrieri in your office?

6       A.    No.

7       Q.    So he was the first one that your office hired?

8       A.    Yes.

9       Q.    Was Mike the first -- withdrawn.

10           Did your office interact at all with the

11   superintendent?

12      A.    We interacted with her administrative assistant,

13   occasionally.

14      Q.    Did your office ever keep the superintendent

15   apprised of the status of investigations that were

16   ongoing?

17      A.    No.

18      Q.    Or the result of investigations?

19      A.    No.

20      Q.    Did your office ever update her on

21   investigations in your office at all?

22      A.    I would update Andra.

23      Q.    Do you know if Andra would update the

24   superintendent?

25           MR. SULLIVAN:  Objection.  Foundation.

1          THE WITNESS:  I don't know.

2     BY MR. RADI:

3          Q.   Did you personally ever discuss any

4     investigations with the superintendent?

5          A.   We discussed the Green case.

6          Q.   The Green case, the one involving the ██████████

7          A.   ████████

8          Q.   Did your office ever provide updates to the

9     Board of Education?

10         A.   I don't recall.

11         Q.   Did you ever personally provide updates to the

12    Board?

13         A.   No.

14         Q.   Does your office currently employ any internal

15    investigators?

16         A.   Yes.

17         Q.   How many?

18         A.   Two.

19         Q.   Who are they?

20         A.   Steffany, S-t-e-f-f-a-n-y, August, like the

21    month; Martha, with an H, last name Gutierrez,

22    G-u-t-i-e-r-r-e-z.

23         Q.   When did Steffany start?

24         A.   January -- both at the same day -- on the same

25    date.  January -- 1st week of January, 2015.

Deposition of Carmina Duran                                    GURRIERI vs. DURAN, et al.

```
 1        Q.   So from October 2014 until the new investigators
 2   were hired, who was conducting investigations for the
 3   Quality Assurance Office?
 4        A.   I hired a private investigator.
 5        Q.   Who was that?
 6        A.   What was his name?  I can't remember his name
 7   right now.
 8        Q.   That's okay.  If you recall later on, you can
 9   fill in the transcript.  We'll leave a blank.
10        A.   I will.
11             Information requested:_____
12   _____
13   _____.
14   BY MR. RADI:
15        Q.   Had you ever used that investigator before?
16        A.   No.
17        Q.   Was this investigator from a company or just --
18        A.   He had --
19        Q.   -- an individual?
20        A.   -- his own investigative firm.
21        Q.   Do you remember the name of the firm?
22        A.   It's his last name.
23        Q.   His last name?
24        A.   Yes.
25        Q.   I expect in like 10 minutes, you'll yell out a
```

1    name out of nowhere.

2         A.   Yes, I probably will.

3         Q.   Did you interview Mike Gurrieri for the

4    position?

5         A.   I was one on the panel.

6         Q.   How many interviews did he have, do you know?

7         A.   He had one interview, and then I followed up

8    with him by phone.

9         Q.   Who was involved in the interview?

10        A.   Amy Bozone.

11        Q.   Who is she?

12        A.   She's assistant general counsel, I think.  She's

13   one of the attorneys in the office; Sergeant Alfonso

14   Contreras; Steven Carr; and myself.

15        Q.   And at the conclusion of that interview, did the

16   panel determine to hire Mike Gurrieri?

17        A.   No.  He was one of the finalists.

18        Q.   Okay.  How many others were there?

19        A.   There was another finalist:  Steffany August.

20        Q.   You said you followed up with a phone call to

21   Mike?

22        A.   Yes.

23        Q.   What was that phone call regarding?

24        A.   I explained to him, I wanted him to know about

25   our office, because it was so new, there was nothing on

1    the website about it.  I wanted him to know about the

2    differences between criminal and administrative

3    investigations, because I had done previously criminal

4    investigations.  And I wanted to make sure that he

5    understood what we did.

6          I also explained the type of challenging parents

7    that we deal with, and the limited resources that we

8    had.

9      Q.    And was it after that phone call that you made a

10   decision to hire him?

11     A.    I followed up with references.

12     Q.    Okay.  And when did you decide to hire him?

13     A.    I don't remember the exact date, but it was

14   shortly thereafter.

15     Q.    Did he have positive references?

16     A.    Yes.

17     Q.    Is there a reason why you chose to hire Mike

18   over Steffany at that time?

19     A.    Based on the references.

20     Q.    Anything else?

21     A.    No.

22          Actually, there is.  May I expand?

23     Q.    On why you chose to hire Mike?

24     A.    Yes.

25     Q.    Sure.

1      A.   One of the things that struck with me was that

2   he mentioned in the phone call that he initially had

3   wanted to be an educator, and he said that this was like

4   a perfect balance, given his background in

5   investigations.

6          He also mentioned that he had worked in an

7   educational institution, and I was particularly impressed

8   with the fact that he had worked for the Teamsters Union,

9   and we dealt with unions a lot in our function.

10     Q.   Okay.  And whose decision was it to hire Mike

11  Gurrieri?

12     A.   It was my decision.

13     Q.   Was anyone else involved?

14     A.   I consulted with Andra, and I explained why I

15  wanted to hire him.  And it was my choice.

16     Q.   Did she agree?

17     A.   Yes, based on my input.

18     Q.   Do you know if she reviewed any of Mike's

19  submissions, meaning his application, or resume, or if

20  she contacted him about the position at all?

21     A.   I provided her with a summary of his background,

22  and why I wanted to select him.

23     Q.   Did you consult with anybody else?

24     A.   I did not.

25     Q.   Do you remember how -- what his salary was when

```
 1    he was first hired?
 2         A.   I do not remember.  70s.  I don't know the
 3    actual amount, but it was in the 70s.
 4         Q.   Do you remember what his salary was when he was
 5    terminated?
 6         A.   I do not.
 7         Q.   Do you recall any benefits that he received?
 8         A.   Fringe benefits included medical, dental,
 9    vision, and retirement contributions.
10         Q.   Anything else?
11         A.   I do not.
12         Q.   Were you aware when you hired Mr. Gurrieri, that
13    he was moving from South Carolina to California for the
14    job?
15         A.   I don't remember where he was living, but I knew
16    that he was moving to San Diego.
17         Q.   Do you know if he was moving from the East
18    Coast?
19         A.   I remember vaguely, he mentioned the East Coast,
20    yes.
21         Q.   Did you have any other meetings with Mike
22    Gurrieri before his first day of work in between hiring
23    him and starting?
24         A.   I do not recall.
25         Q.   Do you recall providing him any training prior
```

1    to him starting his first day of work --

2       A.    No.

3       Q.    -- or an orientation, or anything like that?

4       A.    Prior?

5       Q.    Prior to starting, yes.

6       A.    No.

7       Q.    At any time during his employment, did you

8    provide him any training on how to conduct investigations

9    in the context of the Quality Assurance Office?

10      A.    Yes.  It was ongoing.

11      Q.    So like on-the-job training?

12      A.    Yes.

13      Q.    Other than on-the-job training, did you give him

14   any other training?

15            MR. SULLIVAN:  Objection.  Vague and ambiguous.

16   BY MR. RADI:

17      Q.    Other than on-the-job training, did you train

18   Mike in conducting investigations for the Quality

19   Assurance Office?

20            MR. SULLIVAN:  Objection.  Vague and ambiguous.

21            THE WITNESS:  Can you be more specific?

22   BY MR. RADI:

23      Q.    Sure.  Like did you have, you know, sit-down

24   training session with him or an orientation, or anything,

25   other than on-the-job training?

1    A.   Shortly -- the first week he was hired, I met

2   with him, and I discussed and provided him with the most

3   relevant Administrative Procedures, told him that he

4   needed to become very, very familiar with them.

5        I also discussed at length and provided him

6   copies of the various labor contracts.  We discussed, and

7   I told him, that he needed to become very familiar with

8   the teachers' contract, the section that pertains to

9   investigations.  And I believe that's Section 14, if I

10   recall correctly.

11        And I also talked about the Administrators

12   Association, which represents principals; to become very

13   familiar with that contract because most of our

14   interactions would be with teachers and administrators.

15    Q.   Anything else?

16    A.   Let me think what else.  We talked about our

17   protocols.  We talked about how investigations had to be

18   conducted in accordance with the Administrative Procedure

19   and the contracts; about notifications; about his

20   responsibilities in terms of maintaining objectivity.

21        I explained to him that when I first started

22   working for the District, it was an adjustment for me to

23   come from a criminal background to do administrative

24   investigations.

25        I told him that to utilize the resources that we

1    have in the District; that means you can consult with

2    Legal Services, you can consult with Labor Relations, you

3    can consult with Human Resources.

4         I specifically told him that the job, it was

5    very -- he would be very autonomous; he had to work his

6    cases, and that I was there for him if he needed any

7    guidance.  And obviously, he had a lot of questions.

8    Q.   Was this all during one meeting?

9    A.   No.  That was ongoing.  Every -- there were

10   multiple meetings.

11   Q.   Do you know how many?

12   A.   I don't.  There were multiple.

13   Q.   Do you know when they occurred?

14   A.   We met on a regular basis.

15   Q.   With regard to these things that you just told

16   me that you discussed with him, do you recall when you

17   told him those things?

18   A.   It was first/second week, when I provided him

19   with the documentation and the contracts and protocols,

20   et cetera.

21   Q.   You say you provided him with protocols, is that

22   Exhibit 3 that we looked at earlier?

23   A.   Yes.

24   Q.   So these things that you discussed with him were

25   in multiple conversations during the course of his first

1   couple of weeks?

2        A.   Yes.   I also showed him how to access records

3   online.

4        Q.   Okay.   Anything else?

5        A.   I took him around and introduced him to the

6   various departments:   Human Resources, Benefits, Payroll,

7   Internal Audit, our Police Department, Financial Office.

8             And he also, I believe, I'm not certain,

9   received training on how -- official training from -- how

10  to access our various databases, employee databases.

11       Q.   Anything else?

12       A.   Not that I recall at the moment.

13       Q.   And, again, these additional things were also

14  during his first couple weeks or at another time?

15       A.   The meeting and the introductions and

16  documentation provided was in the first initial weeks,

17  and we had multiple -- we had ongoing meetings and

18  conversations during the duration of his employment.

19       Q.   That would be the on-the-job training that you

20  mentioned earlier?

21       A.   That would be me providing him feedback and

22  constructive criticism.

23       Q.   Is that part of the on-the-job training, or was

24  that different from the on-the-job training that you

25  mentioned --

1     A.   I'm confused when you say "on-the-job training,"

2   because he represented having extensive investigative

3   experience.  So when you say "on-the-job training" --

4     Q.   Well, you said you were training him throughout

5   the course of his employment, so was that -- is that

6   on-the-job training?

7     A.   I was providing him feedback and what I call

8   constructive criticism through the duration of his

9   employment.

10    Q.   And do you consider that training or not?

11    A.   One could consider it training, yes.

12    Q.   I'm asking what you consider it.

13    A.   I consider it training, yes.

14    Q.   Is there any other formal training that he

15   received of which you're aware of?

16    A.   No, not that I'm aware.

17    Q.   You said that you discussed with Mike Gurrieri

18   the Collective Bargaining Agreements and how to -- well,

19   withdrawn.

20         What did you discuss with Mike about Collective

21   Bargaining Agreements and dealing with represented

22   parties?

23    A.   I explained that part of the employees' due

24   process, they have the right to have representation if

25   they choose to have representation during any

1   investigatory meeting.

2      Q.    Anything else?

3      A.    The due process provides the person an

4   opportunity to be -- not an opportunity, it provides

5   them -- or they have the right to know what they're being

6   accused of, of the allegations being raised against him

7   or her, and it provides the employee an opportunity to

8   respond to the allegations.

9      Q.    Anything else that you discussed with him about

10   that?

11      A.    I don't recall. I mean, we had multiple

12   meetings about that.

13      Q.    About dealing with union representation?

14      A.    About following up, which -- let me expand on

15   that. The teachers' union, educators' union, does not

16   allow us to send any type of notification electronically.

17   So it was important that he follow that process and make

18   notification in writing because there was no expectation

19   of privacy to put that type of information that could be

20   perceived as derogatory in an email.

21         So he would ask, "Can I do this?" "Can I send a

22   letter?" "Should I send an email?" "Can I call?" That

23   was ongoing.

24      Q.    Okay. Anything else besides that?

25      A.    I don't recall at the moment.

1    Q.    Did you ever discuss with him the issues of

2    bringing notes or questions to interviews?

3    A.    No.

4    Q.    Did you ever discuss with him whether if he did

5    do that to an interview where the person is represented,

6    that he would -- would or would not have to turn over

7    those notes?

8    A.    I wasn't aware that he was doing that.

9    Q.    Did you ever tell him that his notes would be

10   discoverable in an administrative proceeding when you

11   were discussing with him the procedures for interviewing

12   represented personnel?

13   A.    I told him that a case file was subject to be

14   discoverable.

15   Q.    With regard to the office protocol, did you go

16   through it with him or you just gave him a copy?

17   A.    We went through them.  We went through the

18   protocol.

19   Q.    Did you discuss with him the procedure he should

20   use when he's conducting investigations?

21   A.    "The procedure," can you be more specific?

22   Q.    Did you discuss with him how he was to conduct

23   his investigations?

24   A.    It depends on the type of investigation.

25   Q.    Did you discuss that with him?

 1        A.    We talked about investigating and interviewing

 2    principals, interviewing staff, interviewing parents, and

 3    interviewing students.

 4        Q.    What did you discuss about those things with

 5    him?

 6        A.    If it's a teacher, you have to send

 7    notification; you have to request a meeting, both

 8    teachers and principals, in writing.  If it's parents,

 9    you can send a letter, you can call them, you can email

10    them.  If you interview students, you have to have

11    parental consent.

12        Q.    Anything else?

13        A.    Not at this time.

14        Q.    And when were those discussions about that you

15    just mentioned, about interviews?

16        A.    At the beginning.

17        Q.    First week or later?

18        A.    First week, and then ongoing, depending on what

19    case he had, that I recall, two cases that involved

20    students.

21        Q.    When he was first hired, did you ever discuss

22    with him the steps he should take once a complaint is

23    assigned to him?

24        A.    Yes.

25        Q.    What did you discuss about that?

1      A.    We talked about how he needed to determine what

2    procedure -- what Administrative Procedure was relevant.

3      Q.    Anything else?

4      A.    I told him that it was very important to review

5    the employees' -- all parties' personnel files to see if

6    there was any documentation that was relevant to the

7    investigation.  That's common -- that's standard practice

8    in our office to do that; talked about how -- conducting

9    the interviews; that I prefer that they be done in

10   person.  I also talked about making sure that he

11   documented his interviews, and talked about producing,

12   you know, reports.

13     Q.    Okay.  Did you discuss with him how you wanted

14   the reports to be drafted?

15     A.    I provided him with samples.  And our sample --

16   our styles have evolved from the time that we started.  I

17   told him that it was very important that every report

18   contain, obviously, the person that was complaining, the

19   party that was being identified as the person or persons

20   of interest, the allegations, summary of the interviews.

21           It was -- I had told him that always ask for a

22   witness statement, a written statement from your

23   witnesses, and that his findings and conclusions needed

24   to be corroborated by the best available evidence.

25           And we talked, in extent, about the differences

1  between our prior experience with investigations, that
2  the best available evidence in our cases would be witness
3  testimony.
4      Q.   Okay.  Any other discussions with him about what
5  you were looking for in the reports?
6      A.   I wanted to make sure that he had factual
7  findings, factual conclusions; that he needed to make
8  sure that they were supported.  And if they were not
9  supported, it's -- the findings had to be -- the
10  allegations had to be either sustained or not sustained,
11  and there has to be an explanation as to why, and in some
12  cases, it's going to be inconclusive, and to explain why
13  they're inconclusive.
14      Q.   Anything else?
15      A.   Not that I recall.
16      Q.   Do you remember when you had discussions with
17  him about the reports and the steps he would take during
18  his investigations?
19      A.   We discussed it in the beginning, and we did --
20  and they were ongoing discussions when he started
21  producing a report.
22      Q.   The sample reports that you provided for him to
23  use, were those reports that you had created in the past?
24      A.   They were reports that I -- cases that I had
25  investigated.

1    Q.    Did you discuss with him any additional or
2    different steps he should take in investigating claims of
3    sexual harassment or abuse or assault amongst students?
4    A.    I told him that, obviously, sexual abuse, we
5    don't have the authority to investigate sexual abuse, but
6    we discussed and he was trained in mandated reporting,
7    child abuse reporting.
8          Sexual assaults are investigated by our district
9    police.  We discussed how in cases that involved these
10   type of allegations or incidents, that it was important
11   to consult with our police department and, if necessary,
12   with Legal.
13   Q.    You're referring to student-on-student
14   incidents?
15   A.    Yes.
16   Q.    Did you say that your office doesn't have
17   authority to investigate incidents of sexual abuse
18   between students?
19   A.    Child abuse cases, we do not.
20   Q.    What do you mean by "child abuse"?  How are you
21   using that?
22   A.    Whenever there's a suspicion of a potential
23   child abuse, we are required to make a report.  We are
24   prohibited from conducting an investigation.
25   Q.    So an incident that happens in school between

```
 1   students, would that --
 2        A.   Depending on --
 3        Q.   -- be child abuse?
 4        A.   Depending on the incident.
 5        Q.   Okay.  So your office may or may not be able to
 6   investigate incidents like that.  Is that what you're
 7   saying?
 8        A.   I'm saying that if it's a potential child abuse
 9   case, we do not have the authority to investigate.
10        Q.   So incidents between students happening at the
11   school could be child abuse?
12        A.   Depending on the incident.
13        Q.   Okay.
14             MR. SULLIVAN:  Are you at a good stopping point
15   now?
16             MR. RADI:  It's up to you guys.
17             MR. SULLIVAN:  We've been going about an hour
18   and a half, so maybe this will be a good time.
19             MR. RADI:  You want to stop now, or do you want
20   to stop closer to your call, in a few minutes?
21             MR. SULLIVAN:  It's up to you guys.
22             MR. JANIS:  I need to take off in a few minutes,
23   but you guys can continue.
24             MR. SULLIVAN:  Why don't we take three, four
25   minutes here and stretch our legs, and stuff like that.
```

1              THE WITNESS:  Yes.  Thank you.  I need to

2     stretch my legs.  Thank you.

3              THE REPORTER:  Off the record?

4              MR. SULLIVAN:  Yes.

5              (Recess taken at 11:42 a.m. to 11:54 a.m.)

6              MR. RADI:  Back on the record.

7     BY MR. RADI:

8         Q.   So how do you determine if an incident between

9     two elementary school students on a school campus that

10    involves sexual harassment or assault or abuse

11    constitutes child abuse?

12        A.   I don't determine that.

13        Q.   Who determines that?

14        A.   Either Child Protective Services or the

15    San Diego Police Department.

16        Q.   Okay.  How would you determine if the District

17    should investigate it if it's not determined to be child

18    abuse until it's reported to CPS?

19        A.   So the responsibility is to file the report, not

20    to determine whether it is a child abuse case.  And we

21    wouldn't investigate the actual incident.  We investigate

22    whether the District staff violated any policies or

23    procedure in handling the incident.

24        Q.   Would the District investigate complaints by

25    parents where the complaint is that -- the fact that the

```
 1   incident happened, not how it was handled afterwards?
 2            MR. SULLIVAN:  Objection.  Vague and ambiguous
 3   as to "the complaint."
 4   BY MR. RADI:
 5       Q.   Do you understand what I mean?
 6       A.   No.  Can you repeat that?
 7       Q.   If a parent complaint is that an incident of a
 8   sexual nature occurred, just the fact that it occurred is
 9   what they're complaining about, not how it was handled
10   after, is that something that your office would
11   investigate?
12       A.   I haven't had such a case.
13       Q.   Well, if that came in, would your office
14   investigate that?
15       A.   It depends on the case.  It depends on the
16   nature.  It depends.
17       Q.   Well, if it was an incident like what occurred
18   with the ███████ boy, would your office investigate that?
19       A.   My office would consult with Legal and Police
20   Services first to assist in making that determination.
21            MR. RADI:  Do you have Exhibit 47 and
22   Exhibit 48 from yesterday?
23            MR. SULLIVAN:  Exhibit 47 and Exhibit 48?
24            MR. RADI:  Yes.
25            MR. SULLIVAN:  We're done with Exhibit 3 for the
```

```
 1   time being?
 2           MR. RADI:  Sorry?
 3           MR. SULLIVAN:  We're done with Exhibit 3 for the
 4   time being?
 5           MR. RADI:  Yeah.
 6           MR. SULLIVAN:  I'm trying to keep them in order
 7   so we can find them again.
 8   BY MR. RADI:
 9       Q.   I'm going to -- I'll ask you questions directed
10   to certain portions of these documents.
11       A.   Okay.
12       Q.   But feel free to take the time to review them in
13   as much depth as you want to, just let me know when
14   you're done.
15       A.   Sure.  Okay.  Do you want me to review both?
16       Q.   Sure.  I'll ask you questions about both, so if
17   you would like to review the other one, too, go ahead.
18   But, again, I'll direct your attention --
19       A.   Any section -- if that -- I mean, that's going
20   to take about 30 minutes.
21       Q.   That's why I'm going to direct your attention to
22   certain portions, but it's up to you.
23       A.   I'll review it when you ask me, if I need to
24   review it.  Is that okay?
25       Q.   That's fine.
```

```
 1        A.    Okay.

 2        Q.    So are you familiar with the document that is

 3   marked as Exhibit 47?

 4        A.    Yes, I am.

 5        Q.    What is this?

 6        A.    This is a procedure that outlines probationary

 7   and permanent employees' evaluations.

 8        Q.    Before we get to that, what was Mike Gurrieri's

 9   position classified as?

10        A.    He is a nonrepresented internal investigator.

11        Q.    What does "nonrepresented" mean?

12        A.    It means that he doesn't have a bargaining unit

13   representing him.

14        Q.    Why is that, if you know?

15        A.    I do not know the reason.  There are certain

16   positions in the District, including mine, that are

17   nonrepresented.

18        Q.    Was he a classified employee?

19        A.    He was a classified employee.

20        Q.    And when he was employed, he was probationary,

21   correct?

22        A.    That is correct.

23              MR. RADI:  One moment.

24   BY MR. RADI:

25        Q.    Was he, Mr. Gurrieri, a supervisor or managerial
```

1    employee?

2        A.    He didn't supervise or manage any employees.

3        Q.    Was he -- was his position classified as that?

4        A.    I believe it was classified as supervisory.

5        Q.    What does that mean, "supervisory"?

6        A.    I really don't know.

7        Q.    So he was classified as supervisory, but he

8    didn't actually supervise anyone; is that correct?

9        A.    Correct.

10            MR. SULLIVAN:   It has to do with the National

11   Labor Relations Act.

12   BY MR. RADI:

13       Q.    So Exhibit 47 is Administrative Procedure 7520.

14   Is this the procedure that would apply to the evaluation

15   of Mike Gurrieri?

16       A.    Yes.

17       Q.    Section C, on the first page of Exhibit 47,

18   Number 2, do you see the definition of "Evaluation"?

19       A.    Yes.

20       Q.    Did you ever in your course of -- in your course

21   of employment as executive director, have you ever used

22   the performance evaluation report referenced in this

23   definition?

24       A.    Yes.  Or ...

25       Q.    Is that a report or a form that is created by

```
 1   you or your office, or someone else?
 2        A.    There's no formal form.  It's our interactions,
 3   meetings.
 4        Q.    This definition defines "Evaluation" as "The
 5   careful, systematic appraisal of employee work
 6   performance by an employee's supervisor through use of,
 7   quote, performance evaluation reports ..."
 8             Does your office utilize any performance
 9   evaluation reports?
10        A.    Prior to Mr. Gurrieri?
11        Q.    During his employment.
12        A.    No.
13        Q.    Does your office utilize any performance
14   evaluation reports currently?
15        A.    Yes.
16        Q.    And is that a form?
17        A.    A form.
18        Q.    Who created that form?
19        A.    Human Resources.  I believe it's Human
20   Resources.
21        Q.    When was that form implemented in your office,
22   or the use of that form?
23        A.    Human Resources sends you the form that is
24   scheduled to be completed.  So I don't know when it was
25   created.
```

1        Q.    When did your -- when was the form first

2   provided to your office?

3        A.    For which employee?

4        Q.    Okay.   Withdrawn.

5              So HR sends forms that are specific to certain

6   employees?

7        A.    Yes.

8        Q.    They send those to you?

9        A.    Yes.

10        Q.    When Mike Gurrieri was employed, did HR send

11   those forms to you with regard to any employee?

12        A.    I received the one for Mike Gurrieri.

13        Q.    When?

14        A.    I don't recall.

15        Q.    During his employment?

16        A.    Yes.

17        Q.    You didn't use it during Mike's employment,

18   right, the one for Mike?

19        A.    He was released from probation before I produced

20   the form.

21        Q.    Was he released before the form was produced to

22   you?

23        A.    I don't recall.

24        Q.    Did you use that form for any other employee

25   during the term of Mike's employment?

1      A.    No.

2      Q.    Had you, prior to Mike's employment, used that

3   form in the Quality Assurance Office?

4      A.    No.

5      Q.    Was the form specific to Mike Gurrieri, the

6   first form that had -- that -- the first of those forms

7   that had been sent to you by Human Resources?

8      A.    Can you repeat that, please?

9      Q.    Sure.  Was the form specific to Mike Gurrieri,

10   the first evaluation form that had ever been sent to you

11   by HR in your time as executive director of Quality

12   Assurance?

13      A.    Yes.

14      Q.    And you have received that form for other

15   employees since Mike Gurrieri's employment?

16      A.    Yes.

17      Q.    If you look on the next page of that same

18   exhibit, do you see Number 4; it mentions "Pre-evaluation

19   Counseling"?

20          Do you see that?

21      A.    I do.

22      Q.    It says, "Prior to first scheduled evaluation,

23   each new classified employee shall be given information

24   about the District's performance evaluation form and

25   program and about his or her supervisor's standards."

1          Did you ever schedule an evaluation for Mike

2     Gurrieri?

3          A.    I scheduled a counseling meeting with Mike

4     Gurrieri.

5          Q.    Did you ever schedule a performance evaluation

6     meeting?

7          A.    Yes.

8          Q.    When did you schedule it?

9          A.    The meeting of October, for certain.

10         Q.    Well --

11         A.    October 3rd, I believe.

12         Q.    Is that the date of the meeting, or the date

13    that you --

14         A.    Scheduled?

15         Q.    -- scheduled?

16         A.    I don't remember the date that I scheduled, but

17    I remember meeting with him, specifically to discuss the

18    evaluation.

19         Q.    So on some date, you scheduled a meeting for

20    October 3rd to discuss the performance evaluation?

21              MR. SULLIVAN:  Objection.  Misstates her

22    testimony.

23    BY MR. RADI:

24         Q.    Okay.  You can correct me if it's wrong.

25              Is that what you said?

Deposition of Carmina Duran                                          GURRIERI vs. DURAN, et al.

1          A.    Can you repeat the question?

2          Q.    Well, I'll just ask you again differently.

3          A.    Okay.

4          Q.    You said that you scheduled a meeting to discuss

5     his performance evaluation; is that correct?

6          A.    Yes.

7          Q.    When was that meeting scheduled for?

8          A.    I met with him October the 6th.  And I met with

9     him in September, also.

10         Q.    Do you know in September, when?

11         A.    Prior to me leaving on vacation; I believe it

12    was the 3rd.

13         Q.    Was the September 3rd meeting a scheduled

14    evaluation?

15         A.    It was to discuss the upcoming evaluation.

16         Q.    So the September 3rd meeting was a meeting to

17    discuss a scheduled performance evaluation?

18         A.    Correct.

19         Q.    Did you have that meeting on September 3rd with

20    Mike Gurrieri?

21         A.    I met with Mike Gurrieri before leaving on

22    vacation to discuss the evaluation; to discuss my

23    concerns; and the areas that he needed to improve.

24         Q.    Is that the September 3rd meeting that you

25    mentioned?

1      A.    I believe it was September 3rd.  I know I met

2   with him early September.

3      Q.    Okay.  Tell me everything that you told him at

4   that meeting, as best as you can recall.

5      A.    I recall discussing the cases that he had

6   assigned.  I asked him to provide me with a status of the

7   cases.  I talked to him about my concerns with him

8   conducting and following up with his investigations.  I

9   discussed my concerns with the thoroughness.  We

10  discussed his report writing; that he needed to improve.

11     Q.    Anything else?

12     A.    There were -- long conversation.

13     Q.    Anything else?

14     A.    We talked about every single case that he had

15  assigned, and what needed to be done.

16     Q.    Anything else that you recall?

17     A.    Not at the moment.

18     Q.    You said you discussed thoroughness.  What did

19  you discuss about thoroughness?  Lack of or too thorough?

20     A.    The lack of.

21     Q.    What did you feel was lacking in thoroughness?

22     A.    Following up with information, seeking

23  clarification, confirming information, following up with

24  interviews, pending evidence, or information that was

25  relevant to a case, following up with other departments

1   who may have been working with him.  I talk -- we also

2   talked about the ▬▬▬ investigation, of course.

3      Q.   What did you discuss about the ▬▬▬

4   investigation?

5      A.   The status, where he was going.  We -- I was

6   leaving December -- sorry, September the 12th.  And we

7   talked about how I wanted -- he wanted me to have a

8   chance to review the report before -- before me leaving

9   on vacation.  And he told me that he was going to work on

10  it, and that he was going to -- that his goal was to have

11  it ready before I would leave.

12     Q.   Anything else?

13     A.   Not at the moment.

14     Q.   What did you discuss about his report writing

15  during that meeting?

16     A.   He had poor writing skills.

17     Q.   What was poor about his writing skills?

18     A.   In addition to grammatical errors, the structure

19  of his reports were very poor, didn't follow sequence,

20  the information was confusing at times.  There was not --

21  they were not concise -- clear and concise, and he really

22  struggled with factual determ- -- I mean, coming to a --

23  factual determinations, a conclusion, and how he reached

24  the conclusion, which is very important.

25     Q.   Anything else?

1       A.   No, not that I remember.

2       Q.   At the time of that meeting, was there an

3    evaluation scheduled, a subsequent evaluation?

4       A.   We knew that the -- we talked about how I had to

5    produce a written report, an evaluation report.  And I

6    told him that I wanted him -- before I produced a final

7    report, I wanted to give him an opportunity to improve on

8    the areas that we had discussed.  I told him if there was

9    no improvement, my report would reflect that.

10      Q.   Did you discuss anything else with him about the

11   evaluation or your evaluation report?

12      A.   I told him that I wanted -- I was very

13   transparent with him.  I wanted him to remain on the job.

14   I wanted to help him out, but I needed him to also put

15   effort on his part.

16      Q.   Anything else?

17      A.   I specifically recalled this:  I remember

18   telling him, "Mike, I can support you, and I will give

19   you all that I can, but it's your job.  You have to be

20   able to do the work."

21           MR. SULLIVAN:  In five minutes, we need to stop.

22   I just didn't want you to think I'm springing it on

23   you.

24           MR. RADI:  No problem.  Thank you.

25   /////

```
 1   BY MR. RADI:

 2       Q.    Anything else?

 3       A.    And we talked about his challenges, or he told

 4   me that he was having -- he was experiencing challenges

 5   with conducting these investigations and was frustrated.

 6       Q.    Did he say why?

 7       A.    I remember him talking about he was -- the

 8   ██████. complaint, the investigation was very challenging

 9   for him.

10       Q.    Did he say why?

11       A.    I remember him talking about how he thought that

12   the principal should not be there.  And I told him that

13   that was not something that we could decide at our level;

14   our role is to investigate and provide the findings of

15   our investigation to those who are going to make that

16   decision.

17       Q.    Anything else?

18       A.    I don't recall at the moment.

19       Q.    Okay.  At the time of this discussion, was there

20   a date for the formal evaluation scheduled?

21       A.    I don't recall a specific date, but I told him

22   we would meet again.

23       Q.    Did you ever -- did you ever schedule a formal

24   evaluation?

25       A.    We -- formal?
```

1    Q.   Yeah.  The one that is mentioned in the

2    procedure; did you ever schedule a formal evaluation?

3    A.   We met in October early, when I returned from

4    vacation.

5    Q.   Is that October 6th that you mentioned?

6    A.   Yes.

7    Q.   Was that the scheduled formal evaluation?

8    A.   Yes.

9    Q.   Did you advise Mike Gurrieri prior to that

10   meeting that that would be his scheduled formal

11   evaluation?

12   A.   I don't remember if I phrased it as "formal,"

13   but we discussed "evaluation."

14   Q.   You told him that that would be an evaluation

15   meeting?

16   A.   I told him we would be discussing his

17   performance in the upcoming written evaluation, yes, I

18   did do that.

19   Q.   Did you ever give Mike Gurrieri at any time

20   information about the District's performance evaluation

21   form and program, as is mentioned on the second page of

22   Exhibit 47, Number 4?

23        MR. SULLIVAN:  Sorry.  Which one?  Where is

24   that?

25   /////

1    BY MR. RADI:

2        Q.    It says, Number 4, "... each new classified

3    employee shall be given information about the District's

4    performance evaluation form and program ..."

5              Did you ever give Mike that information at any

6    time?

7        A.    I did not personally give it to him, no.

8        Q.    Do you know if anybody did?

9        A.    It's possible that Human Resources did that at

10   orientation.

11       Q.    When did Mike have orientation?

12       A.    I don't remember the exact date, but that's when

13   his -- he was being processed by Human Resources.

14       Q.    Do you know if he had an eval- -- an orientation

15   with HR?

16       A.    I don't know if he had an orientation.  I

17   believe so.

18       Q.    Was he supposed to have had an orientation with

19   HR?

20       A.    I don't know.

21       Q.    What makes you think he had one?

22       A.    Because HR processes the hiring and the

23   paperwork.  And I know that they have to -- they're

24   provided with certain documentation, about abuse of sick

25   leave, and other policies, but I don't remember exactly

1    the specifics, but there is an orientation.

2         Q.    Do you know what else it entails, the

3    orientation?

4         A.    I don't recall.  I went through one, but I don't

5    recall.

6              MR. RADI:  Last question.

7              MR. SULLIVAN:  Yeah.

8    BY MR. RADI:

9         Q.    You're not sure whether or not HR provided Mike

10   Gurrieri with information on the evaluation form during

11   the orientation or at any time?

12        A.    I wouldn't be privy to that information because

13   I wasn't part of the process.

14             MR. RADI:  Okay.

15             MR. SULLIVAN:  Okay?

16             MR. RADI:  Yep.

17             MR. SULLIVAN:  All right.  Let's break.

18             (Recess taken at 12:19 p.m. to 1:38 p.m.)

19                        -  -  -

20             MR. RADI:  Back on the record.

21

22                   EXAMINATION (CONTINUED)

23   BY MR. RADI:

24        Q.    The September 3rd meeting we were talking about

25   earlier, that was not the scheduled evaluation, right?

Deposition of Carmina Duran                                    GURRIERI vs. DURAN, et al.

1      A.    No.

2      Q.    Was that meeting in preparation for a scheduled

3  evaluation?

4      A.    We discussed issues with the performance.

5      Q.    But was it in preparation for an evaluation?

6      A.    It was leading to the evaluation meeting.

7      Q.    Was it specifically in preparation for that

8  evaluation meeting?

9            MR. SULLIVAN:  Objection.  Asked and answered.

10           THE WITNESS:  It was leading to the -- to

11  writing the evaluation.

12  BY MR. RADI:

13     Q.    Do you have -- withdrawn.

14           Did you make any written notes regarding the

15  September 3rd meeting?

16     A.    I did --

17     Q.    When did you make them?

18     A.    -- I typed them.

19           After my meeting.

20     Q.    On September 3rd?

21     A.    I don't remember if I typed them that day or the

22  next day.  I don't recall.

23           MR. RADI:  I'm going to ask for production of

24  those notes.  I don't believe I've seen them.

25           MR. SULLIVAN:  Yeah.  I am thinking maybe you

1    are confusing your dates on that.  There's -- I haven't

2    seen notes from that -- from that one.

3           MR. RADI:  I am not trying to start a discussion

4    on it, but if they exist, I ask that they be produced.

5           MR. SULLIVAN:  I think she may be just mixing up

6    her dates.

7           THE WITNESS:  Yeah, I know that whatever I have,

8    it was produced.  Whatever notes I took, it was

9    produced.

10   BY MR. RADI:

11      Q.   So the question is, do you know if you made

12   notes on or around September 3rd regarding the

13   September 3rd meeting?

14      A.   I don't.

15      Q.   If you had, if you did that, they were produced?

16   Is that your testimony?

17      A.   Yes.

18      Q.   And if no such notes were produced, does that

19   mean that you did not make any on that day or around that

20   day about that meeting?

21      A.   Right.  Correct.

22      Q.   Did you create any writing on or around

23   September 3rd regarding the September 3rd meeting with

24   Mike Gurrieri?

25      A.   No.

|

1    Q.    Did you follow up in writing with him regarding

2  your discussion on September 3rd?

3    A.    No.

4    Q.    Did you put in writing any of the issues or

5  concerns you discussed at the September 3rd meeting on or

6  around September 3rd?

7    A.    No.

8    Q.    Is there any reason that you didn't make notes

9  or follow up in writing with Mike regarding the

10  September 3rd meeting?

11    A.    I didn't.

12    Q.    You said that you also met with Mike on

13  October 6th, correct?

14    A.    Correct.

15    Q.    Was that meeting a scheduled performance

16  evaluation?

17    A.    Scheduled.

18    Q.    I'm sorry?

19    A.    No.  We discussed his performance leading up to

20  the evaluation.

21    Q.    So this October 6th meeting was not the

22  performance evaluation meeting?

23    A.    Not the official, no.

24    Q.    So this was leading up to that?

25    A.    It was leading up to, yes.

1       Q.   At that meeting, did you schedule a subsequent

2   performance evaluation meeting with Mike Gurrieri?

3       A.   On that day?

4       Q.   Yes.

5       A.   A scheduled one?  No.  We were meeting

6   regular --

7       Q.   I'm saying, during that meeting, did you

8   schedule a subsequent meeting that would be the --

9       A.   I told him --

10      Q.   Hold on.  It's just for her.

11           Did you schedule a subsequent meeting that would

12   be the performance evaluation meeting?

13      A.   I'm sorry?

14      Q.   For example, on October 6th, when you met with

15   Mike, did you set a date for a subsequent meeting that

16   would be the performance evaluation meeting?

17      A.   I said we would be meeting again, but I did not

18   say -- specify a day.

19      Q.   And did you say that that would be his

20   evaluation?

21      A.   I said that we would be discussing his

22   evaluation.  I did not provide him with a specific date.

23      Q.   When you say "discussing his evaluation," what

24   did that mean?

25      A.   I wanted to give him an opportunity to improve.

1    Q.   Was that next meeting that you told him you

2    wanted to schedule, which you didn't give him a date for,

3    would that be the performance evaluation that is referred

4    to in Exhibit 47, the Administrative Procedure?

5         MR. SULLIVAN:  I didn't bring my exhibits.

6         MR. RADI:  You can look at mine.

7         THE WITNESS:  I'm looking at 4.

8    BY MR. RADI:

9    Q.   You can look at whatever will help you answer

10   the question.  You don't have to confine your answer to

11   that paragraph.

12   A.   I consider my meetings with him as evaluations

13   of his performance.

14   Q.   Let me see it.

15        The October 6th meeting was not the scheduled

16   evaluation that is referred to in these procedures, was

17   it?

18   A.   No.

19   Q.   At the October 6th meeting, you told Mike that

20   you wanted to have another meeting to discuss his

21   performance, right?

22   A.   I told him that I would have to write a

23   performance evaluation, and that I had concerns with his

24   performance, and that I wanted him to show improvement.

25   Q.   Did you tell him that you would meet with him

```
 1   again, subsequently?

 2       A.   Yes.

 3       Q.   And was that subsequent meeting that you told

 4   him you wanted to have, was that to be the scheduled

 5   evaluation that is referenced in this policy here --

 6       A.   Between --

 7       Q.   -- or was it another --

 8       A.   We had multiple meetings.

 9       Q.   -- pre-evaluation?

10       A.   Right.  We had multiple meetings.

11       Q.   I understand.  I'm just trying to find out what

12   the purpose of the next meeting that you intended to have

13   with him was --

14       A.   Specifically to discuss evaluation and concerns,

15   was October -- the -- October 20th, I believe.  But there

16   were meetings between the 6th and the 20th.

17       Q.   Tell me everything that you discussed during

18   that October 6th meeting.

19       A.   I can't recall.

20       Q.   As best you can recall.

21       A.   We discussed my concerns with Mike, Mike's lack

22   of improvement.  We discussed my concerns with his

23   investigations, with his lack of timeliness and

24   thoroughness.  There was no significant improvement from

25   our previous discussions.  I told him that I had to write
```

1   an evaluation, but I wanted to see some improvement

2   before it was finalized.

3        Q.   Had you started drafting an evaluation

4   prior -- withdrawn.

5             Had you already started drafting an evaluation,

6   when you say you wanted to see improvement, before it was

7   finalized?

8        A.   An actual draft, no.

9        Q.   So what did you mean by "finalized"?

10       A.   Return -- turning it in to Human Resources.

11       Q.   But you hadn't written anything down yet?

12       A.   No, not in my -- evaluation form, no.

13       Q.   What else did you tell him?

14       A.   It was a long conversation, but we discussed his

15   performance, his substandard performance, and my

16   expectations, and what he needed from me:  "How can I

17   support you?  What can I do to help you meet the

18   standards?"  But I don't remember specifically if it

19   was -- it was about his performance.

20       Q.   Do you remember anything else?

21       A.   We talked about the -- going forward, that cases

22   we get -- we would get more cases, and that I expected

23   him to complete investigations in a timely and thorough

24   manner, and after six months on the job, I wanted to see

25   some improvement, and I wasn't -- hadn't seen that.

1    Q.   Anything else?

2    A.   I don't recall at the moment.

3    Q.   When a case was assigned to the investigator,

4  did -- withdrawn.

5        Did particular cases have certain dates that

6  they had to be -- that the investigation had to be

7  concluded by?

8    A.   The only cases that have a timeline are Uniform

9  Complaints, and -- which are the complaints that pertain

10  to sexual harassment or discrimination on a basis of

11  protected class, but none of the 9430 complaints,

12  they're -- no timelines.

13    Q.   Did any of the cases assigned to Mike Gurrieri

14  have timelines?

15    A.   I don't recall.

16    Q.   Do you recall if you ever gave Mr. Gurrieri a

17  timeline with regard to any of his investigations?

18    A.   I did not give him a specific timeline, but I

19  wanted him to be timely.

20    Q.   What was "timely"?

21    A.   I wanted to see progress in the investigation.

22  I wanted to see that he was moving the case; that there

23  was some movement, some progress.

24    Q.   Did you ever say anything to him about how long

25  an investigation on a particular case should take?

Deposition of Carmina Duran                                    GURRIERI vs. DURAN, et al.

1        A.    The question is too vague.  It depends on what
2    the issue is.
3        Q.    Well, did you ever say anything to him about how
4    long any of his investigations should take?
5        A.    I didn't give him a specific timeline.
6        Q.    On October 6th, do you remember what concerns
7    about his investigations and reports you discussed with
8    him?
9        A.    We were discussing the cases that were assigned
10   to him at that time.
11       Q.    So you were just discussing specific cases?
12       A.    Correct.
13       Q.    What about the cases were you discussing?
14       A.    I was asking him for feedback.  I was asking him
15   to provide me with a status and what he had done on the
16   cases and what he planned on doing.
17       Q.    You asked him to provide you a verbal status at
18   that meeting, or something --
19       A.    At that meeting.
20       Q.    Okay.  And was he able to do that?
21       A.    He gave me a vague summary of what he intended
22   to do, yes.
23       Q.    Do you recall anything else that you said during
24   that meeting, generally or specifically?
25       A.    Well, we discussed the -- his -- his intent to

1    complete the investigation report on the ███████ case

2    before I left on vacation.

3         Q.   On the October 6th meeting?

4         A.   No.  You're referring to the September meeting

5    or October?

6         Q.   No, October.

7         A.   Oh, October.  I'm sorry.

8              No.  In October, where we discussed my concerns

9    with him ending the interview with the Labor

10   representative and Ms. Montero.  I talked to him about

11   being concerned and disappointed that he did not want to

12   attend the meeting with the ███████.  I told him that he

13   had put Andra and Sofia in a disadvantage because he had

14   personal knowledge about the investigation.  I told him

15   that as the investigator of record, I expected him that

16   going forward, he would attend these meetings.

17        Q.   I just want to clarify.  A couple questions I

18   asked you, prior to this last question --

19        A.   Okay.

20        Q.   -- when you were giving your answers that were

21   discussed during the meeting --

22        A.   Uh-huh.

23        Q.   -- were you talking about the October meeting or

24   the September meeting?

25        A.   The last answer that I gave?

```
 1        Q.   Not this one just now, the couple before that.
 2   Were you clear that it was -- that I was asking you about
 3   October?
 4             I just want to be sure --
 5             MR. SULLIVAN:  There's some confusion there.
 6             THE WITNESS:  Yes, I am confused.  I'm sorry.
 7             MR. RADI:  Okay.
 8             MR. SULLIVAN:  I think she was talking about
 9   September.
10             MR. RADI:  I believe I said October, but it's
11   okay.
12             MR. SULLIVAN:  I think you did, but I think --
13             MR. RADI:  Okay.  No problem.
14             MR. SULLIVAN:  -- you guys miscommunicated
15   because you were talking about both.
16             MR. RADI:  Okay.  We'll fix it.
17   BY MR. RADI:
18        Q.   So I'm going to be talking about October --
19        A.   Okay.
20        Q.   -- at this point; October 6th.
21        A.   Okay.
22        Q.   So October 6th meeting, you discussed Mike not
23   wanting to go to the ▮▮▮▮▮▮ meeting, and canceling the
24   interview with the represented employee?
25        A.   Yes.
```

1      Q.   What else?

2      A.   We discussed his -- the status of his cases.

3      Q.   Anything else?

4      A.   I don't recall.

5      Q.   Okay.  And because I think there was some

6   confusion before, was this October 6th meeting, this was

7   not his performance evaluation meeting, right, the one

8   referenced in the policies?

9      A.   No.  But we were discussing the coming --

10   upcoming evaluation.

11      Q.   Okay.  So during this October 6th meeting, you

12   discussed the upcoming evaluation?

13      A.   We discussed my concerns with his performance.

14      Q.   Did you discuss that "there will be a meeting

15   upcoming that is a performance evaluation meeting"?

16      A.   I recall telling him that we would be meeting

17   again.

18      Q.   Did you tell him that it was for the purpose of

19   a performance evaluation meeting?

20      A.   Not specifically.  I don't recall.

21      Q.   Okay.  What else did you discuss at the

22   October 6th meeting besides ▇▇▇▇▇▇ the interview, the

23   union employee, and the status of his cases, and that

24   there would be another meeting?

25      A.   Well, we talked about the -- again, the concerns

1    that I had with his performance.

2        Q.   So what concerns did you discuss at the

3    October 6th meeting, specifically, if you can

4    differentiate for me the prior meeting?

5        A.   It was the bulk about infor- -- of the

6    discussion was those -- the ██████ meeting and the

7    cancellation of the interview with the labor union, and

8    the concerns about the lack of follow-up on the

9    ██████ -- that he did not follow up or clarify the

10   information that was brought to Sofia's and Andra's

11   attention.

12            There was some inconsistencies, or -- if you

13   want to call it that, in his report, that he had failed

14   to address prior to submitting the report.

15       Q.   Anything else?

16       A.   Not that I recall.

17       Q.   The meeting with the ██████ that you

18   referenced, do you recall Mike Gurrieri asking you

19   whether or not he had to attend prior to the meeting with

20   the ██████?

21       A.   He sent me an email while I was out on vacation.

22       Q.   Do you recall what it said?

23       A.   He was asking permission, I guess, to decline.

24       Q.   Did you respond to him?

25       A.   I don't believe I responded.  I don't recall.

1       Q.    Did he state to you that he was refusing to go?

2       A.    He didn't use the word "refuse."

3       Q.    Did he ask your permission to not attend?

4       A.    He said, "I" -- he wanted to decline.

5       Q.    Why didn't you respond to him?

6       A.    I can't tell you why I didn't.  I just didn't

7    respond.

8       Q.    Could you have told him that he had to go and to

9    go?

10      A.    Could I have told him that?

11      Q.    Yes.

12      A.    I didn't want to tell him that.  I wanted him to

13   know that he -- it was his responsibility to be there.

14      Q.    Did you say that to him after he asked you if he

15   could decline?

16      A.    I was not in the office.  I was out of the

17   country, but we had a discussion when I returned.

18      Q.    Okay.  But that was after the meeting, right?

19      A.    After the meeting.

20      Q.    So before the meeting, did you ever indicate to

21   him, verbally or in writing, that it's his responsibility

22   and he should go, or direct him to go?

23      A.    I did not.

24      Q.    Do you know why he didn't go, or why he

25   didn't -- ultimately ended up not going?

```
 1              MR. SULLIVAN:  Objection.  Vague and ambiguous;
 2    speculation.
 3              THE WITNESS:  I don't know.
 4    BY MR. RADI:
 5        Q.   Let me -- let me rephrase it.
 6              Did anybody tell him that he didn't have to go
 7    to the ███████ meeting?
 8        A.   I don't know if anybody told him.
 9        Q.   Do you think that he just didn't show up without
10    it being approved by anybody?
11        A.   I don't.
12        Q.   Do you know if Andra Donovan told him that he
13    did not have to go?
14        A.   I don't know if she told him directly.  I don't
15    know.
16        Q.   Do you know if anybody told him to go and he
17    just didn't go?
18        A.   I don't.
19        Q.   Do you think that's what happened?
20        A.   I don't want to speculate.  I don't know.
21        Q.   Do you know why -- withdrawn.
22              Did Mike Gurrieri tell you why he didn't want to
23    go to the meeting?
24        A.   In his email, he referenced that he didn't think
25    that it was appropriate for the person who conducted the
```

```
 1    investigation to be at that meeting.

 2         Q.    Did he say why?

 3         A.    He anticipated that the ████████ were not going

 4    to be happy or satisfied with the investigation findings.

 5         Q.    Did he say why he thought they wouldn't be

 6    satisfied?

 7         A.    I don't recall him stating that in the email.

 8         Q.    Did he ever state it to you verbally or in

 9    another writing?

10         A.    I don't recall.

11         Q.    Do you know who scheduled the meeting with the

12    ████████

13         A.    I don't know.

14         Q.    Did you think it was a good idea to hand the

15    ████████ a report in person?

16              MR. SULLIVAN:  Objection.  Assumes facts.

17              THE WITNESS:  I don't know.

18    BY MR. RADI:

19         Q.    Did you have an opinion on it, on whether or not

20    it was a good idea?

21         A.    I knew that the law required that, and I wanted

22    to comply.

23         Q.    The law required the report to be turned over at

24    an in-person meeting?

25         A.    In an in-person meeting?
```

1       Q.    Yes.

2       A.    I don't know that the law requires an in-person

3    meeting.  But I know that it's -- it's happened for the

4    contact.  We meet with parents when they're not satisfied

5    or they have questions about the investigation, yes.

6       Q.    In the ▉▉▉▉ case, did you think -- did you

7    have an opinion on whether or not it was a good idea to

8    personally hand-deliver the investigation report to the

9    ▉▉▉▉▉▉▉

10            MR. SULLIVAN:  Objection.  Asked and answered.

11            THE WITNESS:  It's been done before, so -- and I

12   don't know that it's a legal requirement to hand it to

13   the person, but I know that it was -- the law required

14   that we provide them a copy of the report.

15   BY MR. RADI:

16      Q.    But I'm asking what your opinion was in this

17   specific case with the ▉▉▉▉▉

18      A.    I don't know.

19      Q.    Did you ever tell Samantha Clabaugh that the

20   meeting was a bad idea, either verbally or in writing?

21      A.    I remember telling her that it was a bad idea to

22   have the meeting at Green, at the school.

23      Q.    Why?

24      A.    Because it was a very small community, and

25   everybody knew each other.  And I just didn't think that

1   it was a good idea to have it at the school where people

2   know what is going on.

3        Q.   But you thought it was a good idea to have it

4   anywhere else?

5        A.   It would have been more appropriate.

6        Q.   Would it have been a good idea or bad idea?

7        A.   More appropriate.

8             To have it somewhere else?

9        Q.   Yeah.

10        A.   In this particular case?

11        Q.   With the █████████

12        A.   My opinion?

13        Q.   Uh-huh.

14        A.   I would have it at the Quality Assurance Office.

15        Q.   Did you state in writing or verbally to Samantha

16   Clabaugh that you thought it was a bad idea to have the

17   meeting at Green?

18        A.   I don't remember.

19        Q.   You said that there was an issue with Mike

20   Gurrieri terminating an interview?

21        A.   There was a huge concern, yes.

22        Q.   What was that about?

23        A.   The concern was that he was tasked with an

24   investigation, and he deemed necessary to interview a

25   party.  He was the one facilitating the meeting, and he

 1    is the one who ended it.

 2         Q.   Do you know why?

 3         A.   I know what he told me why he ended up.

 4         Q.   Okay.  What did he tell you?

 5         A.   He told me that he ended the meeting because

 6    they asked him for copy -- a copy of the script that he'd

 7    brought to the meeting.  And when he did not provide it

 8    to them, that the union representative advised him that

 9    he was in violation of the contract.  And he told me that

10    he wasn't going to risk losing a case, so he ended the

11    meeting.

12         Q.   Did you ever learn that the representative had

13    an issue with the fact that Quality Assurance was

14    conducting the investigation in the first place?

15         A.   That's what they claimed; that they had an

16    issue, yes.

17         Q.   Under the relevant bargaining agreement with

18    that party, was Mike required to turn over his notes to

19    the representative?

20         A.   The contract does not specify that you have to

21    turn in your notes, but it does state that the party will

22    be advised of the allegations that are being raised

23    against him or her.

24         Q.   Are you -- is it your testimony that Mike never

25    advised the party of the allegations against her?

1          A.    I don't know if he did advise her of the

2     allegations.  I wasn't at the meeting.

3          Q.    Well, wouldn't the party be advised of the

4     allegations prior to the meeting?

5          A.    He's the one who facilitated the meeting.  I

6     don't know what information was related to her by Mike.

7          Q.    What is the normal procedure to advise the party

8     of the allegations?

9                MR. SULLIVAN:  Objection.  Vague and ambiguous.

10    BY MR. RADI:

11         Q.    What is the normal procedure in advising a

12    represented party of allegations made against the party?

13               MR. SULLIVAN:  Objection.  Vague and ambiguous.

14               THE WITNESS:  It depends on the -- I testified

15    before that complaints are investigated in accordance

16    with the procedure imparted in the contract.

17    BY MR. RADI:

18         Q.    Well, in this specific instance, what would have

19    been the procedure for advising -- was it Daniza

20    Montero? --

21         A.    Daniza Montero.

22         Q.    -- for advising her that there were complaints

23    against her?

24         A.    They provide the respondent a copy of the

25    complaint form, but in the course of your investigation,

1   if other issues arise that are not noted in the formal

2   complaint, then the party has the right to be advised of

3   those allegations.

4        Q.   Do you know whether she was advised of the

5   initial complaint against her?

6        A.   When she was advised, I do not.

7        Q.   No.  Do you know if?

8        A.   If?

9        Q.   Uh-huh.

10       A.   I don't know.

11       Q.   Do you know if additional allegations were

12   brought during the course of the investigation?

13       A.   I don't remember.  I don't know.  I don't

14   remember.

15       Q.   What does -- what does turning over his

16   questions or notes to the representative have to do with

17   advising the party of the allegations against them?

18       A.   It wasn't necessarily the notes, is that they

19   wanted to fully understand what was being asked.  And

20   according to the representative, he refused to allow them

21   that opportunity.  That's what they reported.

22       Q.   He refused to allow them the opportunity to?

23       A.   To understand the questions that he was asking,

24   that he planned on asking.

25       Q.   They complained that he would not give a copy of

1    his questions to them?

2        A.    They complained that he did not want to give

3    them a copy of the script that he brought to the meeting.

4    And when they asked that he speak slowly and -- so they

5    could understand, and loudly, so they could understand

6    him, that he refused to do that.

7        Q.    Did -- what did Mike say about that, refusing to

8    speak slowly?

9        A.    He denied it.

10       Q.    Do you know one way or the other whether that is

11   what happened; that he refused to speak slowly?

12       A.    He -- I don't know.  I mean, I know that Daniza

13   and -- or at least that's what I was told, that Daniza

14   Montero and the labor representative related that

15   information to our Labor Relations director.

16            And Samantha told me that Mike told her that he

17   did not want to give them his script because he didn't

18   want to risk losing a case.

19       Q.    Did he use those words, "losing a case"?

20       A.    That's what she told me.

21       Q.    Were those her words exactly, "losing a case"?

22       A.    She told me that Mike told her those words.

23       Q.    Those exact words?

24       A.    Yes.

25       Q.    Do you know if Mike was concerned about

1    compromising the investigation by turning over his notes?

2         A.   I don't know if he was concerned or not.

3         Q.   Did he ever say that to you?

4         A.   He said that he did not want to risk losing a

5    case.  He didn't know if he was -- he didn't want to

6    compromise that.

7         Q.   I'm saying to you, did he ever say he was

8    concerned about compromising the investigation?

9         A.   Yes.

10        Q.   With regard to this specific instance?

11        A.   Yes.

12        Q.   Did he also say that he was concerned about

13   potentially violating the party's rights if he proceeded

14   with the investigation?

15        A.   He may have.

16        Q.   Did he say that if she was entitled to the

17   questions, that he wanted to give them to her and did not

18   want to violate her rights by not giving them to her?

19        A.   I don't recall him saying that.

20        Q.   Since the Collective Bargaining Agreement was

21   unclear on that issue, as you stated earlier, do you

22   think it was reasonable for him to adjourn the interview

23   to give him time to research or figure out the answer to

24   that question and then reschedule it later?

25             MR. SULLIVAN:   Objection.  Misstates the

 1   witness' testimony.

 2          THE WITNESS:  I think that he could have taken a

 3   break -- first of all, I think that he could have spoken,

 4   as requested, slowly and loudly so they can understand

 5   the questions.

 6   BY MR. RADI:

 7      Q.   But they'd also asked for a copy, right?

 8      A.   But when he declined, they asked him to speak

 9   loudly and slowly so they could understand.  So they were

10   compromising, and he did not want to compromise.

11      Q.   But if they were entitled to a copy, and he

12   didn't give it to them, that would have been a violation

13   of the party's rights, correct, under the Collective

14   Bargaining Agreement?

15          MR. SULLIVAN:  Objection.  Misstates the

16   witness' testimony.

17          THE WITNESS:  I'm not a labor expert.

18          MR. RADI:  I'm not misstating her testimony.

19   I'm just asking a question.

20          MR. SULLIVAN:  You just said, "Oh, you testified

21   this way," and that it was unclear, and now you are

22   saying that if it was --

23          MR. RADI:  There is still a question there.

24          MR. SULLIVAN:  Well, I know, but you're trying

25   to put words in her mouth multiple times, multiple

1    different ways.

2           MR. RADI:  I'm asking a question.

3           MR. SULLIVAN:  No.

4           MR. RADI:  She can tell me yes or no.

5           MR. SULLIVAN:  You're not asking a fair

6    question.  You're trying to ask a lot of trick questions.

7           MR. RADI:  I don't ask trick questions.

8           MR. SULLIVAN:  Oh, you absolutely do.

9    BY MR. RADI:

10       Q.   Did you say earlier that the Collective

11   Bargaining Agreement was unclear as to whether or not

12   Mike should have turned over his written questions to the

13   representative?

14       A.   It doesn't specify that if you bring a script,

15   that you need to turn it in.  It doesn't say that.

16       Q.   It doesn't say that?

17       A.   A script, no.

18       Q.   Okay.  So it doesn't say either way?

19       A.   I don't believe it does.

20       Q.   Okay.  So then would you say -- would you

21   describe the Collective Bargaining Agreement as being

22   clear or unclear on the issue of whether an investigator

23   has to turn over his written questions or script, as you

24   call it, to a party during an interview?

25       A.   I'm not able to answer that because it doesn't

1   specify the word "script."

2       Q.   What does it specify?

3       A.   Well, we're talking about a script.

4       Q.   What does it say that has to be turned over?

5       A.   I would have to look at the contract.  I

6   don't rem- -- I don't have it memorized.

7       Q.   Okay.  When you say "script," what do you mean?

8       A.   He brought, from my understanding, specific

9   questions that he intended to ask the -- the subject.

10      Q.   And does "script" mean that he was going to read

11  verbatim those questions and only those questions and not

12  say any other words during the interview?

13      A.   It appeared so.

14      Q.   Is that what you -- withdrawn.

15           Do you know if that is what happened?

16      A.   I wasn't there.

17           MR. SULLIVAN:  Objection.  Vague and

18  ambiguous.

19  BY MR. RADI:

20      Q.   So do you know?

21      A.   Pardon me?

22      Q.   So do you know?

23      A.   I don't.

24      Q.   So if the Collective Bargaining Agreement

25  doesn't mention turning over scripts specifically, do you

 1   think it was reasonable for him to adjourn the meeting so
 2   that he could determine whether or not he had to give it
 3   to the party?
 4       A.   He should have -- as they were willing to
 5   compromise, he should have compromised, and he should
 6   have spoken slowly and loudly so they could understand
 7   what was being asked.
 8       Q.   So if he did agree to speak slowly and loudly,
 9   but didn't turn over the questions, could the union still
10   have filed a grievance for him not turning over the
11   questions if he was supposed to?
12       A.   I can't speculate.
13           MR. SULLIVAN:  Objection.  Calls for
14   speculation.
15   BY MR. RADI:
16       Q.   I'm sorry?
17       A.   I can't speculate.
18       Q.   So you don't know either way, right?
19       A.   I don't want to speculate.
20       Q.   What was the problem with terminating an
21   interview and rescheduling for a later time, in your
22   opinion?
23       A.   I don't know that he planned on scheduling it at
24   a later time.
25       Q.   Did he say that to you?

```
 1        A.    No, he didn't.

 2        Q.    Did anybody say that to you?

 3        A.    No.

 4        Q.    So if he did plan on scheduling at a later time,

 5   what was the problem with that?

 6        A.    He didn't say that he planned on interviewing

 7   her at a second -- at a later time.  He never said that.

 8        Q.    Did you ask him that?

 9        A.    I did.

10        Q.    What did he say?

11        A.    He didn't respond.

12        Q.    You asked him the question, and he just sat

13   there and -- with a blank face and said nothing?

14        A.    No.  He was pretty angry.

15        Q.    Did he -- he just said nothing when you said

16   that?

17        A.    He was angry.  I recall that he was angry.

18        Q.    But what did he say?

19        A.    He never said anything specific about it.

20        Q.    Do you think it's reasonable for him not to want

21   to violate or potentially violate somebody's rights when

22   he's conducting an investigation and interviewing people?

23              MR. SULLIVAN:  Objection.  Argumentative;

24   assumes facts not in evidence; incomplete hypothetical.

25              THE WITNESS:  I don't know how I can answer
```

 1   that.

 2   BY MR. RADI:

 3        Q.    Why?

 4        A.    Because it depends on the situation.

 5        Q.    What does it depend on?

 6        A.    It depends on the circumstances.

 7        Q.    What does it depend on?

 8        A.    It depends --

 9        Q.    What are the circumstances?

10        A.    It depends on the circumstances.  It depends on,

11   was he -- if the documents that -- that were being asked,

12   if it was an ongoing investigation, that the

13   investigation had not concluded, and you have information

14   that could potentially put another person at risk, then

15   perhaps that would have not been a good idea to do that.

16        Q.    So you don't know in this case whether it was a

17   good idea or not to adjourn the interview?

18        A.    In this particular case, if he adjourned when he

19   could have continued the meeting if he had complied with

20   the request?  It was -- it was a bad idea to adjourn the

21   meeting.  What they were asking was not unreasonable.

22        Q.    Do you know if a grievance was ever filed as a

23   result of that interview?

24        A.    Yes.

25        Q.    Was one?

1      A.    There was one filed.

2      Q.    Do you know what the grievance was for or what

3   it alleged?

4      A.    It was alleged that -- that I believe that he

5   had violated the contract by terminating the interview.

6      Q.    They complained about him terminating the

7   interview or about the fact that the interview was being

8   conducted by Quality Assurance in the first place?

9      A.    Their allegation -- part of the allegation was

10  that Quality Assurance did not follow the process when,

11  in fact, Quality Assurance had followed the process, and

12  Mike had that information that he could have told them

13  that.

14     Q.    What was their complaint that Quality Assurance

15  did not follow the process?

16     A.    They believed -- the contract calls for

17  resolution at the lowest level, and there's an escalation

18  procedure.  First, it goes to the principal; principal to

19  area superintendent.  Both principal and area

20  superintendent had been advised of the complaint, and

21  resolution was not achieved at that level.  So those

22  steps had been in place.

23     Q.    And Mike was aware of that?

24     A.    Yes.

25     Q.    And did he pass that information on to the

```
 1   union?

 2        A.   I don't know if he did.

 3        Q.   Did -- was the representative or the party aware

 4   of that, that the prior steps had taken place?

 5             MR. SULLIVAN:  Objection.  Calls for

 6   speculation.

 7             THE WITNESS:  I don't know.

 8   BY MR. RADI:

 9        Q.   Is that something that you think they should

10   have been aware of?

11             MR. SULLIVAN:  Objection.  Vague and ambiguous.

12             THE WITNESS:  I don't know.

13   BY MR. RADI:

14        Q.   So there was no grievance filed with regard to

15   him turning over the questions or not speaking slowly?

16             MR. SULLIVAN:  Lacks foundation.

17             THE WITNESS:  I know they complained.

18   BY MR. RADI:

19        Q.   I'm saying -- I'm talking about a grievance.

20        A.   Formal grievance?

21        Q.   Yes.

22        A.   I don't know.

23        Q.   Do you know how that grievance was resolved?

24        A.   I wasn't part of a resolution.

25        Q.   So you don't know either way?
```

1        A.   Let me think for a minute.

2             MR. SULLIVAN:  Lacks foundation; calls for

3    speculation.

4             THE WITNESS:  I don't recall.

5    BY MR. RADI:

6        Q.   At the October 6th meeting, did you advise Mike

7    Gurrieri about your standards, as set forth in the

8    District procedure?

9        A.   Which procedure?

10       Q.   Exhibit 47, Procedure 7520.

11       A.   The entire procedure, or are we talking about a

12   specific section?

13       Q.   Section C4 says, "... each new classified

14   employee shall be given information about the district's

15   performance evaluation form and program and about his/her

16   supervisor's standards."

17            Did you give him information about your

18   standards?

19       A.   I had been giving him information about

20   standards.

21       Q.   What were your standards that you told him?

22       A.   Timely, thorough investigations, objectivity,

23   writing factual reports.

24       Q.   Anything else?

25       A.   Reaching conclusions and explaining the reason

1    how he reached those conclusions.

2        Q.   Anything else?

3        A.   I don't recall.

4        Q.   Did you conduct subsequent counseling after

5    October 6th, prior to a final performance evaluation

6    meeting?

7        A.   We had numerous meetings.

8        Q.   How many meetings after October 6th did you

9    have?

10       A.   I don't recall.

11       Q.   Do you recall what you discussed at any of these

12   meetings?

13       A.   Case status, progress.

14       Q.   Anything else?

15       A.   Improvement; I wanted to see improvement in his

16   report writing.

17       Q.   Anything else?

18       A.   Maintain objectivity, stay focused.

19       Q.   Anything else?

20       A.   I don't recall.

21       Q.   You don't know the dates of any of those

22   meetings that occurred after October 6th?

23       A.   There were numerous meetings.

24       Q.   How many?

25       A.   I don't know.

1    Q.   Well, if he only worked there for another two

2    and a half weeks, does that help you remember how many

3    meetings there might have been?

4    A.   No.

5    Q.   Did you make any -- withdrawn.

6         Did you put in writing anything you discussed at

7    the October 6th meeting?

8    A.   I believe I prepared a summary.

9    Q.   Any other writings regarding the October 6th

10   meeting?

11   A.   I don't recall.

12   Q.   Did you put anything in writing to Mike Gurrieri

13   about the October 6th meeting?

14   A.   No.

15   Q.   Why not?

16   A.   I didn't.

17   Q.   Any particular reason?

18   A.   Pardon me?

19   Q.   Any particular reason?

20   A.   I wanted to give him an opportunity to improve.

21   Q.   All right.  Is there a reason that you wouldn't

22   put in writing what you wanted him to improve and send it

23   to him?

24   A.   There's no particular reason.

25        MR. RADI:  Mark this as Exhibit 51.

```
 1              (Exhibit 51 marked for identification.)
 2    BY MR. RADI:
 3        Q.   Take a moment to review it, and let me know when
 4    you're done.
 5              MR. RADI:  Marked as Exhibit 51 is a document
 6    produced as P 00555.
 7              THE WITNESS:  Okay.
 8    BY MR. RADI:
 9        Q.   Is this the entirety of your notes regarding
10    your October 6th meeting?
11        A.   I believe so.
12        Q.   Do you have -- are there any other writings or
13    notes regarding the October 6th meeting, other than that
14    document?
15        A.   No.
16        Q.   Do you know when you created this document?
17        A.   I do not.
18        Q.   Did you create it on October 6th?
19        A.   I don't know.
20        Q.   So you don't know if you created it after that
21    or on that date?
22        A.   I don't recall.
23        Q.   Does this document -- withdrawn.
24              Does this document memorialize everything that
25    was discussed during the October 6th meeting?
```

1     A.    It's a summary -- pardon me.  It's a summary of

2   our discussion.

3     Q.    Is there anything that was discussed that is

4   not included in this document?

5     A.    I don't recall.  Possibly.

6     Q.    As you sit here now, to your knowledge, does

7   this encompass everything that you discussed?

8     A.    Not everything.  It's a summary.

9     Q.    But you can't recall everything that is not in

10  the document that was discussed?

11        MR. SULLIVAN:  Objection.  Argumentative; vague

12  and ambiguous.  You've just asked her about this meeting

13  for the last 20 minutes, and she has given you a bunch of

14  detail.

15  BY MR. RADI:

16    Q.    Looking at this document, can you recall

17  anything that's not included in this that was

18  discussed --

19        MR. SULLIVAN:  Objection.  Vague and

20  ambiguous.

21  BY MR. RADI:

22    Q.    -- at the meeting?

23    A.    I can't say that.  I can't.

24    Q.    Was that the first time that you discussed with

25  Mike his concern about meeting with the ▮▮▮▮▮ and his

 1   not wanting to do that?

 2        A.   Possibly, that's the date -- my first day back

 3   after vacation.

 4        Q.   Did you discuss that with him at any other

 5   times?

 6        A.   Prior to this?

 7        Q.   At -- after this or before.

 8        A.   Yes.

 9        Q.   When?

10        A.   I don't recall.

11        Q.   But this was the first time you discussed it?

12        A.   Yes.

13        Q.   So then it's your testimony that you discussed

14   not meeting with the ████████ after October 6th, also?

15        A.   Possibly, yes.

16        Q.   And these notes don't mention that you discussed

17   performance evaluations or performance evaluation

18   meetings.  Does that mean that you did not discuss that?

19        A.   It doesn't mean that.

20        Q.   If you discussed it, wouldn't it be in this

21   discussion?

22        A.   Not necessarily.

23        Q.   Why not?

24        A.   It was a summary of my meeting.

25        Q.   Could you put a -- have put a sentence

1    summarizing the discussion about performance evaluations

2    and that you would be scheduling one?

3              MR. SULLIVAN:  Objection.  Argumentative.

4              THE WITNESS:  I can't tell you what I was

5    thinking back then, but it's just a summary of my

6    meeting.

7    BY MR. RADI:

8         Q.   Aside from not attending the meeting with the

9    ██████████ and the issue with the union, does this document

10   discuss any other concerns that you had with his

11   performance?

12        A.   Well, I expect reports to be accurate and

13   factual, so I'm sure we discussed his report writing.  We

14   discussed the status of assigned cases.  I'm sure that we

15   discussed that in detail.

16        Q.   Did you ever ask Mike to prepare an action plan

17   for his cases?

18        A.   Yeah.  I believe I did, yes.

19        Q.   Do you remember when you first asked him to do

20   that?

21        A.   I don't.

22        Q.   Did you ever tell him what an action plan was?

23        A.   It's self-explanatory.

24        Q.   Did you ever tell him what it was?

25        A.   He never asked what it was.

1          Q.    Did you ever tell him what it was?

2          A.    No.

3          Q.    Is there -- did you ever give him a form or

4     format to use for an action plan?

5          A.    He never asked for one.

6          Q.    Did you ever give him one?

7          A.    No.

8          Q.    Does your office have one?

9          A.    A form?

10         Q.    Yeah.  Or a format that you use when you create

11    an action plan?

12         A.    No.  Not a specific form, no.

13         Q.    Okay.  Do you expect action plans to be in a

14    particular format?

15         A.    Not in a particular format, but there's certain

16    information that should be in the action plan.

17         Q.    What should be in it?

18         A.    There should be what steps do you plan on taking

19    to resolve your case; when do you expect to take these

20    actions; who is going to participate in these actions.

21         Q.    Anything else?

22         A.    When you plan on concluding.

23         Q.    Okay.  Anything else?

24         A.    Possibly, but I can't think of anything right

25    now.

1   Q.   Do you recall if you ever scheduled the

2   performance evaluation that is discussed in the

3   evaluation of classified staff procedure?

4   A.   I know that we were discussing the performance

5   evaluation, and I know that we were discussing what he

6   needed to improve, and I know that I told him that I

7   wanted to see some improvement before I would produce the

8   final document.   I was trying to help him.

9   Q.   Did you ever schedule the official performance

10  evaluation meeting?

11  A.   We discussed meeting on the 23rd --

12  Q.   Okay.

13  A.   -- formally, when he was in my office on the

14  22nd.

15  Q.   Were either of those meetings, the 22nd or the

16  23rd, the scheduled performance evaluation meeting?

17  A.   Again, we had several meetings discussing the

18  evaluation report.   The last meeting that we had was the

19  22nd, and we were supposed to meet on the 23rd.

20  Q.   So my question is, if you look at the

21  procedures, Exhibit 47 --

22  A.   Yes.

23  Q.   -- says that there is to be a scheduled

24  evaluation.   So were either the 22nd or the 23rd that

25  scheduled evaluation?

```
 1        A.    Possibly the 23rd.

 2        Q.    Why do you say "possibly"?  Do you know if it

 3   was or not?

 4        A.    Because that meeting never materialized.

 5        Q.    So you had a meeting scheduled for the 23rd?

 6        A.    We were scheduled to meet on the 23rd.

 7        Q.    And it never happened?

 8        A.    No.

 9        Q.    Did you schedule that meeting to be the

10   scheduled evaluation?

11        A.    Formal scheduled evaluation --

12        Q.    The one that is referenced in the procedure --

13        A.    -- no.

14        Q.    -- in the policy?

15        A.    No.

16        Q.    So that formal scheduled evaluation meeting, you

17   never scheduled, correct?

18        A.    We were scheduled to meet on the 23rd to discuss

19   his evaluation.

20        Q.    Okay.  But you just said that that was not his

21   scheduled evaluation that's mentioned in the policy?

22        A.    If you ask me to reference that, no.

23        Q.    So that you never scheduled the evaluation that

24   is mentioned in this policy; is that correct?

25        A.    Correct.
```

```
 1        Q.   Okay.  Do you recall what happened at the
 2   meeting on the 22nd?
 3        A.   We had a long meeting.
 4        Q.   How long?
 5        A.   Over an hour, possibly longer.
 6        Q.   What happening in the meeting?
 7        A.   We discussed a lack of progress.  We discussed
 8   the cases.  I'm sorry.  The 22nd you said?
 9        Q.   Yes.  And by the way, was this a scheduled
10   meeting, the 22nd; had you planned it ahead of time with
11   him?
12        A.   Yeah.  We had talked about meeting on the 22nd.
13             MR. SULLIVAN:  I believe she has notes from that
14   meeting.
15             THE WITNESS:  Can I --
16             MR. SULLIVAN:  It might help her by seeing the
17   notes.
18             THE WITNESS:  Right.
19   BY MR. RADI:
20        Q.   Okay.  I'm going to --
21        A.   Can I look at my notes?
22        Q.   Well, I'll ask you questions about them, but I
23   want to get your recollection.
24             MR. SULLIVAN:  He wants to try to ask you trick
25   questions first, without the notes in front of you.
```

```
 1              MR. RADI:  Counsel, stop your comments.

 2              MR. SULLIVAN:  Well, it's --

 3              MR. RADI:  You don't bully me, and I'm not

 4   scared of you, so just stop.

 5              MR. SULLIVAN:  It's just --

 6   BY MR. RADI:

 7       Q.   Please just --

 8              MR. SULLIVAN:  I'm not trying to scare you.  I'm

 9   just --

10   BY MR. RADI:

11       Q.   Please just tell me everything that you recall.

12              MR. SULLIVAN:  Please don't interrupt me.

13              MR. RADI:  I am --

14              MR. SULLIVAN:  I am stating for the record that

15   you are not -- she's asked for her notes --

16              MR. RADI:  That's fine --

17              MR. SULLIVAN:  Let me finish my statement.

18              THE REPORTER:  One at a time, please.

19              MR. SULLIVAN:  Stop interrupting me.

20              MR. RADI:  No.

21              MR. SULLIVAN:  Yes.

22              MR. RADI:  Stop yelling.

23              MR. SULLIVAN:  Okay.  We're adjourning the

24   deposition now.  You can go back to New York --

25              MR. RADI:  Sit down and stop yelling.  Don't
```

1    stand up and start yelling at me.

2          MR. SULLIVAN:  No, I'm just standing up to get

3    out of the room.  You continually interrupt, and it's

4    just offensive.  We are going off the record.

5          MR. RADI:  We're going to call the judge.

6          MR. SULLIVAN:  Call the judge.

7          THE REPORTER:  Off the record?

8          We are now off the record.

9          (Recess taken at 2:33 p.m. to 2:50 p.m.)

10          MR. SULLIVAN:  Back on the record.

11          We're going to give the deposition another

12    chance here.  But for the record, I'm going to be clear,

13    that, one, this is the final time that I'm willing to go

14    forward with the deposition, be interrupted by counsel

15    and not allowed to state my position.  I'm entitled to do

16    that.  He refused to not interrupt me and let me speak

17    and respond to his statements.

18          It's not professional, and we're not willing to

19    go forward with the deposition with a one-sided record in

20    that regard.  And I will be happy to bring that to the

21    Court's attention.

22          And, for the record, I want it noted that the

23    client has requested a copy of her notes from

24    conversations from two years ago.  Counsel has declined

25    to provide them.  While he has specifically promised the

```
 1    witness that he will not ask trick questions, he has

 2    consistently asked questions that both the witness and I

 3    feel are trick questions by asking repetitive questions,

 4    and has been noted on a few occasions misstating her --

 5    her testimony in subsequent questions, and the record

 6    will show that quite clearly.

 7            With that, if you want to proceed with asking

 8    questions, you can do so.  If you're going to ask her

 9    questions about meetings at which she had notes, and you

10    have those notes, we would request that you provide those

11    to the witness so that she can have those to refresh her

12    recollection.

13            MR. RADI:  I am agreeing to proceed with the

14    deposition with the understanding that counsel will stop

15    standing up and yelling and making speaking objections,

16    coaching the witness, and just being completely rude.

17            I'm not asking trick questions.  I'm asking

18    completely proper questions.  I don't need to provide the

19    witness with a document if I'm asking her independent

20    recollection.  If I feel I want to provide the document,

21    I will.  It's my deposition; I will conduct it as I need

22    to.

23            MR. SULLIVAN:  Okay.  I haven't been standing up

24    during the deposition.  I stood up when I said I was

25    adjourning the deposition to leave, and that was the one
```

```
 1    time that I've stood up during the deposition.  And I --
 2             MR. RADI:  And yesterday --
 3             THE REPORTER:  Say that again?
 4             MR. RADI:  I'm sorry.  I thought you were done.
 5    I apologize.
 6             MR. SULLIVAN:  Geez, it's just a consistent
 7    effort to interrupt.  It's just astonishing.
 8             MR. RADI:  You paused.  I thought you were done.
 9             Are you done?
10             MR. SULLIVAN:  You know, just ask your
11    questions.
12             MR. RADI:  I don't want to interrupt.
13             MR. SULLIVAN:  You know, the record is -- the
14    record is clear.  I don't raise my voice.
15             MR. RADI:  I'm happy to rely on the record and
16    show it to the judge.
17    BY MR. RADI:
18       Q.   What do you recall about your meeting with Mike
19    on October 22nd?
20       A.   I recall discussing his performance --
21    substandard performance.  I recall discussing my
22    expectations.  I recall telling him that I may have to
23    release him from probation if I didn't see any
24    improvement.
25       Q.   Anything else?
```

1    A.   I would have to look at my notes.  Two years ago

2  is a long time.

3    Q.   Do you remember anything Mike said during that

4  meeting?

5    A.   I remember that he was upset.

6    Q.   Anything he said?

7    A.   He said that he wasn't sure if this was the job

8  for him.

9    Q.   Did he explain what he meant by that?

10    A.   He said that it was too hard.

11    Q.   Did he say what he meant by that?

12    A.   I would have to look at my notes to remember

13  specifics, but he was talking about how he was

14  struggling, and this was the hardest job that he had ever

15  done.  He wasn't sure if he needed to go back to law

16  enforcement.

17       I don't remember if it was that day or the day

18  prior, but we had that conversation.  And that he didn't

19  know if he wanted to stay.

20    Q.   Do you recall him saying why he thought the job

21  was too difficult?

22    A.   I remember him saying something about political.

23    Q.   Did he say the job was too political, or he

24  believed it was?

25    A.   Again, without looking at my notes, he said

1    something about the job being political or maybe the

2    environment was political, something to that effect.

3        Q.   Did he explain what he meant by "political"?

4        A.   I don't -- I would have to look at my notes.  I

5    don't remember.

6        Q.   Did you have an understanding what he meant by

7    "political"?

8        A.   No, not really.

9        Q.   Did he say how or why he was struggling?

10       A.   I remember him saying that this was the hardest

11   job he'd ever done.

12       Q.   Do you remember him saying anything else?

13       A.   Again, without looking at my notes, I don't

14   remember.

15       Q.   In between October 6th and October 22nd, you

16   said you had multiple meetings with Mike about his

17   performance, right?

18       A.   Yes.

19       Q.   Did you make any notes or any writings regarding

20   any of those meetings?

21       A.   Well, you showed me the meeting notes from

22   October the 6th.

23       Q.   Right.  So in between that -- after that and

24   prior to October 22nd?

25       A.   I don't recall if I started writing my

1   conversations with him on the 20th and 21st.

2       Q.   So you had meetings on the 20th and 21st, that

3   you recall?

4       A.   Yes.

5       Q.   Did you read -- did you make any writings

6   regarding any meetings prior to the 20th and 21st and

7   after October 6th?

8       A.   I don't recall.

9       Q.   Did you put anything in writing to Mike about

10  the discussions at any of those meetings between

11  October 6th and 20th or 21st?

12      A.   Provide him with a summary of my meetings with

13  him?

14      Q.   Did you provide him with any writing

15  memorializing anything that happened in the meetings or

16  setting forth issues you wanted him to work on?

17      A.   I don't believe so.

18      Q.   Do you remember what happened in the meeting on

19  October 20th?

20      A.   What do you mean, what happened?

21      Q.   Well, you said you had a meeting with Mike on

22  the 20th, you believe, right?

23      A.   Yes.

24      Q.   So what occurred during that meeting?

25      A.   Again, we talked production.  We talked cases.