UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


MICHAEL GURRIERI, an individual,       )

       Plaintiff,                        )

    vs.                                    ) No. 15CV1674 W BLM

CARMINA DURAN, an individual,          )

ANDRA DONOVAN, an individual,          )

and CINDY MARTEN, an individual,       )

in their individual capacities,        )

      Defendants.                       )

————————————————————————————————       )


UNDER SEAL PURSUANT TO PROTECTIVE ORDER

DEPOSITION OF CINDY MARTEN

(PAGES 1 - 79, INCLUSIVE)

August 18, 2016


Reported by:  Antonia Sueoka, CSR No. 9007, RPR



# KRAMM
## COURT REPORTING

2224 THIRD AVENUE, SAN DIEGO, CALIFORNIA 92101

800.939.0080     619.239.0206     kramm.com
*telephone*          *facsimile*          *web*

DISC
ENCLOSED



**DISC CONTAINS:**

.txt/ASCII of Transcript  ·  PDF of Transcript  ·  PDF of Exhibits  ·  Condensed Transcript with Word Index

Deposition of Cindy Marten                                    GURRIERI vs. DURAN, et al.

```
 1                      I N D E X

 2

 3   EXAMINATION                               PAGE

 4   CINDY MARTEN

 5   BY MR. RADI                               5

 6

 7                      EXHIBITS

 8   EXHIBIT      DESCRIPTION                  PAGE

 9   Exhibit 53   SDUSD Agenda Item Details, Meeting   71

10                November 18, 2014, Category I.

11                Superintendent's Consent Agenda

12                         - - -

13   PREVIOUSLY MARKED EXHIBITS

14   Exhibit 46

15   Exhibit 49

16   Exhibit 50

17                         - - -

18              QUESTIONS NOT ANSWERED

19                    PAGE   LINE

20                     28    18

21                     62    11

22                     64     4

23                     64    21

24             INFORMATION REQUESTED

25                    (NONE)
```

```
 1                        APPEARANCES:

 2

 3     FOR THE PLAINTIFF:

 4     SOKOLOFF STERN, LLP

 5     BY:  MARK A. RADI, ESQUIRE

 6     179 Westbury Avenue

 7     Carle Place, New York  11514

 8     516.334.4500

 9     mradi@sokoloffstern.com

10       and

11     JANIS LAW GROUP

12     BY:  DEAN T. JANIS, ESQUIRE

13     550 West C Street, Suite 1155

14     San Diego, California  92101

15     619.814.3526

16     dean.janis@janislaw.net

17

18     FOR THE DEFENDANTS:

19     PAUL, PLEVIN, SULLIVAN & CONNAUGHTON, LLP

20     BY:  MICHAEL C. SULLIVAN, ESQUIRE

21     101 West Broadway, Ninth Floor

22     San Diego, California  92101

23     619.237.5200

24     msullivan@paulplevin.com

25
```

```
 1                    APPEARANCES (CONTINUED)

 2

 3   THE WITNESS:

 4   CINDY MARTEN

 5   (No address provided.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20                      *  *  *  *

21         DEPOSITION OF CINDY MARTEN

22   taken at 101 West Broadway, Ninth Floor, San Diego,

23   California 92101, commencing on Thursday, August 18,

24   2016, at 10:05 a.m., before Antonia Sueoka, Certified

25   Shorthand Reporter, CSR No. 9007, RPR.
```

```
 1          SAN DIEGO, CALIFORNIA, THURSDAY, AUGUST 18, 2016,

 2                       10:05 A.M.

 3                        - - -

 4                   CINDY MARTEN,

 5    having been administered an oath, testified as follows:

 6

 7                    EXAMINATION

 8    BY MR. RADI:

 9       Q.   Good morning.

10       A.   Good morning.

11       Q.   My name is Mark Radi.  I represent the

12    plaintiff, Michael Gurrieri, in this lawsuit.  I'm going

13    to be asking you a number of questions this morning.  I

14    ask that you give me truthful answers, to the best of

15    your recollection.

16            If I ask you any questions that you don't

17    understand, please ask me to rephrase it, and I will try

18    to rephrase it so that you can understand it.  Okay?

19       A.   Yes.

20       Q.   And if you answer a question without telling me

21    that you didn't understand it, I'll assume that you

22    understood it and that your answer is accurate.  Is that

23    okay?

24       A.   That's okay.

25       Q.   Let me finish asking the question before you
```

```
 1    start to give your answer, and I'll also try not to speak

 2    over you.

 3            And if you need a break at any time, just let me

 4    know.  And it's fine, as long as there's no question

 5    pending.  Okay?

 6        A.   Okay.

 7        Q.   Did you take any medication that would affect

 8    your ability to testify this morning?

 9        A.   No.

10        Q.   Is there any medication you were supposed to

11    take that you didn't take that would affect your ability

12    to testify?

13        A.   No.

14        Q.   Okay.  Can you tell me, what college degrees do

15    you have?

16        A.   A Master's in Curriculum and Instruction, and a

17    Bachelor's in Education.

18        Q.   Any other degrees?

19        A.   I have some certificates:  literacy specialist,

20    reading specialist, certificate in special education,

21    and -- I don't think special education is a certificate;

22    I think it's just a minor in college, but it's a -- and

23    an Administrative Services credential.

24        Q.   Anything else?

25        A.   No.
```

1    Q.   How long have been superintendent of the

2    San Diego Unified School District?

3    A.   Beginning my fourth year.  July 1st, 2013, was

4    the official start date.  I was appointed in February of

5    2013.

6    Q.   Prior to being appointed superintendent, were

7    you employed by the District?

8    A.   I was.

9    Q.   What capacity, and from when to when?

10   A.   I was a teacher and a vice principal and a

11   content administrator and a principal for San Diego

12   Unified, and that began in, I believe it was, in 2000 --

13   I forgot the exact date.  But I worked in a different

14   school district before San Diego Unified, but about 14

15   years in San Diego Unified.

16          Most recently, before superintendent, I was a

17   principal.

18   Q.   How long were you a principal in the District?

19   A.   I think it was three years.

20   Q.   What school were you principal of?

21   A.   Central Elementary.

22   Q.   How long were you content administrator?

23   A.   I don't remember the dates.  I --

24   Q.   Do you know how long?

25   A.   All of those positions were within a 10-year

1    period, and they were all at Central Elementary.

2    Teacher, vice principal, content administrator, and

3    principal, all those positions were at that same school,

4    and I don't remember the time frame of each one.

5         Q.   Do you know how many years you were a teacher at

6    the District?

7         A.   In San Diego -- I've been a teacher -- I was a

8    teacher for 17 years before I became an administrator.

9         Q.   Elementary?  Secondary?

10        A.   Elementary.

11        Q.   What grade?  What grades?

12        A.   Primary grades.

13        Q.   K through 5?

14        A.   Uh-huh.  Yes.  Sorry.

15        Q.   Prior to San Diego Unified, what school district

16   did you work for?

17        A.   Poway Unified.

18        Q.   Can you spell it?

19        A.   Poway, P-o-w-a-y.

20        Q.   How long were you there?

21        A.   Seven years.

22        Q.   What positions did you hold there?

23        A.   Classroom teacher and school-wide literacy

24   administrator -- or literacy specialist.

25        Q.   Do you have any other experience as a principal

```
 1    or vice principal outside of the District, San Diego

 2    Unified?

 3         A.    No.

 4         Q.    Do you have any other administrative experience

 5    outside of San Diego Unified?

 6         A.    No.

 7         Q.    When was the Quality Assurance Office started?

 8         A.    Shortly after I began as superintendent, but I

 9    don't remember the exact date.

10         Q.    Was it in 2013?

11         A.    It may have been.

12         Q.    What is the purpose of the Quality Assurance

13    Office?

14         A.    To make sure that the public has access to

15    support, and it's a one-stop shop for any information or

16    support that community, families, even employees, have

17    one number to call instead of trying to navigate our

18    large system.

19         Q.    Carmina Duran is the executive director of

20    Quality Assurance, right?

21         A.    Yes.

22         Q.    Did you recommend her for that position?

23         A.    I was part of a team that did, yes.

24         Q.    Does the executive director of Quality Assurance

25    report to you, the superintendent?
```

```
 1        A.    No.

 2        Q.    Does it report to the Board?

 3        A.    No.

 4        Q.    Who does the executive director report to?

 5        A.    I believe it's to general counsel, Andra

 6   Donovan.

 7        Q.    Who does Andra Donovan report to?

 8        A.    She has a dual reporting line to myself and to

 9   the Board of Education.

10        Q.    Were you ever made aware that the Quality

11   Assurance Office hired an internal investigator named

12   Michael Gurrieri?

13        A.    No.

14        Q.    Were you ever aware that the Quality Assurance

15   hired an internal investigator?

16        A.    Not specifically.

17        Q.    Do you know if the Quality Assurance Office

18   employs internal investigators to investigate complaints?

19        A.    Do I know -- excuse me.  Do I know what?

20        Q.    Do you know whether the Quality Assurance Office

21   employs investigators to investigate complaints?

22        A.    Yes, I believe they have investigators.

23        Q.    Have you ever met Mike Gurrieri?

24        A.    I don't think so.  I may have, but ...

25        Q.    Do you know where you may have met him, if you
```

Deposition of Cindy Marten                                    GURRIERI vs. DURAN, et al.

```
 1   did --
 2        A.    No.
 3        Q.    -- where it would have been?
 4        A.    No.
 5        Q.    Were you ever made aware that Mr. and Mrs.
 6   ████████ had filed a complaint with the Quality Assurance
 7   Office?
 8        A.    Yes.
 9        Q.    When did you first become aware of the ████████
10   complaint?
11        A.    I don't remember.
12        Q.    How did you become aware of the complaint?
13        A.    I don't remember.
14        Q.    Do you remember who told you about the
15   complaint?
16        A.    No, I do not.
17        Q.    What were the allegations of the ████████
18   complaint?
19        A.    My recollection is they had a concern about an
20   incident with their son.
21        Q.    What was the incident?
22        A.    Something involving an incident in the bathroom
23   with two young boys; their son and another boy.
24        Q.    Do you know what happened in the bathroom, or
25   what they alleged happened in the bathroom?
```

```
 1        A.    I don't know details of it.

 2        Q.    What do you know about it?

 3        A.    That there was an act between the two boys of a

 4   sexual nature.

 5        Q.    Do you know what type of act it was?

 6        A.    I think it was oral copulation.

 7        Q.    Do you know what the ██████ complaint was?

 8        A.    They were concerned about several things.

 9   Specifically, their concerns were around the principal's

10   follow-up and response to what had happened.

11             And the thing that caught my interest was their

12   concern about the Quality Assurance report, and how long

13   it took, and being able to get their answers -- their

14   questions answered.

15             And that being a new office for me, I wanted to

16   make sure the Quality Assurance Office was, in fact,

17   assuring quality and that our family members that needed

18   support were getting it.

19        Q.    Was the concern about the Quality Assurance

20   Office's report one of the ██████ original complaints?

21        A.    I don't remember that.

22        Q.    Was that a complaint that was investigated by

23   Quality Assurance?

24        A.    What complaint?  A complaint about a report --

25        Q.    Yes.
```

1       A.    -- invest- -- I don't know.

2       Q.    Do you recall any other complaints that the

3   ███████   had made about the incident in the bathroom?

4       A.    No.

5       Q.    Do you think that that was a serious incident

6   that occurred?

7            MR. SULLIVAN:   Objection.   Vague and ambiguous.

8   BY MR. RADI:

9       Q.    I'm referring to the incident in the bathroom

10  between the boys; do you think that was a serious

11  incident?

12      A.    It's an incident -- those types of incidents

13  happen, that I think it's a matter of judgment whether

14  it's serious or not.

15      Q.    In your opinion --

16      A.    I didn't know the details of it, so I couldn't

17  make that judgment.

18      Q.    In your opinion, is an incident between two

19  boys -- two kindergarten boys in the school bathroom

20  where one of them forces oral copulation on another a

21  serious incident?

22      A.    It depends.

23      Q.    What does it depend on?

24      A.    The individuals and the circumstances.

25      Q.    So that may or may not --

Deposition of Cindy Marten                                    GURRIERI vs. DURAN, et al.

```
 1        A.    Are other disabilities involved?  Are there
 2   other things?  What -- I need to know all the facts
 3   before I would determine the seriousness of it.
 4        Q.    So it may or may not be serious to you?
 5        A.    It depends.
 6        Q.    Do you think that that type of incident should
 7   be reported to CPS?
 8        A.    Mandate -- mandate report.
 9        Q.    So an incident like that should be reported?
10        A.    Of course.
11        Q.    Even though it may not be serious?
12        A.    We're mandated reporters as educators.  We're
13   required to report any incident of that nature.
14        Q.    Whether --
15        A.    We don't determine whether it's serious or not;
16   they do.
17        Q.    Why do you think it would be important to report
18   incidents of that nature to CPS?
19        A.    I just explained that we were mandated to report
20   incidents of that nature; so that's why it's important to
21   follow the mandate that is required under our
22   credentials.
23        Q.    Any other reason why it's important to report?
24        A.    I've already answered that.
25        Q.    Okay.  I'm asking if there's any other reasons
```

Deposition of Cindy Marten                                        GURRIERI vs. DURAN, et al.

```
 1    besides it being mandated?

 2       A.    No.

 3       Q.    Was the ████████ -- investigation of the ████████

 4    complaint a priority to you?

 5             MR. SULLIVAN:  Objection.  Vague and

 6    ambiguous.

 7    BY MR. RADI:

 8       Q.    You can answer.

 9       A.    Say that again?

10       Q.    I'll rephrase.

11             Was the ████████ complaint -- was it a priority

12    to you that the ████████ complaint be investigated?

13             MR. SULLIVAN:  Objection.  Vague and

14    ambiguous.

15             You can answer if you understand.

16             THE WITNESS:  Was it important that the ████████

17    complaint be investigated?

18    BY MR. RADI:

19       Q.    Was it one of your priorities?

20             MR. SULLIVAN:  Objection.  Vague and ambiguous.

21             THE WITNESS:  Yeah, I think I need more

22    clarification.

23    BY MR. RADI:

24       Q.    Was investigation of the ████████ complaint a

25    priority of yours --
```

Deposition of Cindy Marten                                    GURRIERI vs. DURAN, et al.

```
 1              MR. SULLIVAN:  Objection.
 2   BY MR. RADI:
 3       Q.   -- at the time that you learned of the
 4   complaint?
 5              MR. SULLIVAN:  Objection.  Vague and
 6   ambiguous.
 7              THE WITNESS:  Can you be more specific?
 8   BY MR. RADI:
 9       Q.   I can't.  Can you answer the question?
10       A.   I'm not sure I completely understand it.
11       Q.   You don't -- do you understand what "priority"
12   means?
13       A.   Yes.
14       Q.   Okay.  So was this complaint a priority to you?
15       A.   The complaint to -- about what happened at the
16   school?
17       Q.   Yes.  The ████████ complaint that they filed --
18       A.   Quality Assurance Office is a priority to me.
19       Q.   Okay.  Was this particular complaint a priority?
20       A.   And the qual- -- and the nature of the ████████
21   concern about not getting quality -- not getting answers
22   quickly enough, that was a concern to me.  That's what
23   was a priority.  Was my Quality Assurance Office working
24   in the way that I wanted it to work to serve the public;
25   not this specific case, but did the office work in the
```

```
 1    way I wanted it to work is what my concern and my

 2    priority was.

 3         Q.   When you first learned about the complaint

 4    before it was investigated, was it a priority to you?

 5         A.   I didn't learn about the case before it was

 6    investigated, so no.

 7         Q.   When did you first learn about the ███████

 8    complaint?

 9         A.   I don't remember.

10         Q.   Did you ever tell anybody that the case -- that

11    the ███████ complaint should be a priority?

12         A.   I don't remember.

13         Q.   Did you ever tell Andra Donovan that the ███████

14    complaint should be a priority?

15         A.   I don't remember.

16         Q.   Did you ever tell Carmina Duran that the ███████

17    complaint should be a priority?

18         A.   I don't remember.

19         Q.   Do you think it should have been a priority?

20              MR. SULLIVAN:  Objection.  Asked and answered.

21              MR. RADI:  I didn't ask that.

22    BY MR. RADI:

23         Q.   You can answer.

24              MR. SULLIVAN:  Counsel, you've asked 15

25    questions about priority --
```

```
 1   BY MR. RADI:
 2       Q.   I'm asking now --
 3            MR. SULLIVAN:  -- without any definition.
 4   BY MR. RADI:
 5       Q.   -- now, as you sit here today, do you think that
 6   it should have been a priority?
 7            You understand what "priority" means, right?
 8            MR. SULLIVAN:  Objection.  Vague and ambiguous.
 9            THE WITNESS:  The general term of the word
10   "priority," I understand the definition of the dictionary
11   of "priority."  But in terms of a superintendent has many
12   priorities, and the priorities that I hold and what --
13   what -- what we specifically mean by "priority," I think
14   I would want more clarification.
15            I couldn't tell you the dictionary definition of
16   the word, but in the capacity of leading a District with
17   17,000 employees and what my priorities are, I would want
18   you to clarify more.
19   BY MR. RADI:
20       Q.   Did you ever tell the investigator investigating
21   the complaint that it should be a priority with regard to
22   other investigations?
23       A.   No.
24       Q.   Did you think that the ████████ complaint should
25   be a priority with regard to other investigations in the
```

```
 1    Quality Assurance Office?
 2        A.    No.
 3        Q.    Did you ever tell anybody in the Quality
 4    Assurance Office that it should be?
 5        A.    No.
 6        Q.    Did you ever tell Andra Donovan that the
 7    investigation of the ██████ complaint should take
 8    priority over other investigations in the Quality
 9    Assurance Office?
10        A.    I don't remember.
11        Q.    Did you want the ██████ complaint to be
12    thoroughly investigated by Quality Assurance?
13        A.    I want all cases to be fully investigated by
14    Quality Assurance.
15        Q.    So was that a yes?
16        A.    Yes.
17        Q.    Do you think it's important to thoroughly
18    investigate complaints that come into the Quality
19    Assurance Office?
20        A.    Yes.
21        Q.    Why?
22        A.    So that we can assure quality.  I want the
23    investigations to be thorough and complete, as well as
24    accurate.
25        Q.    Did you ever discuss the ██████ complaint or
```

Deposition of Cindy Marten                                    GURRIERI vs. DURAN, et al.

```
1    investigation with Mike Gurrieri, the internal

2    investigator, who was assigned to the case?

3         A.   No.

4         Q.   Did you ever discuss it with any investigator?

5         A.   No.

6         Q.   Did you ever discuss the ▮▮▮▮▮ complaint and

7    investigation with Andra Donovan?

8         A.   Yes.

9         Q.   How often would you discuss the ▮▮▮▮▮

10   investigation and complaint with Ms. Donovan?

11        A.   I don't know the exact number of times.

12        Q.   Well, about how often?  Daily?  Weekly?

13   Monthly?

14        A.   I don't remember.  Periodic updates.

15        Q.   Did you ever discuss the ▮▮▮▮▮ investigation

16   or complaint with Carmina Duran?

17        A.   I may have.

18        Q.   Do you know how many times?

19        A.   No.

20        Q.   Do you know how often?

21        A.   No, I do not.

22        Q.   Do you know if it was more than one time?

23        A.   It may have been.

24        Q.   What do you recall discussing with Andra Donovan

25   about the ▮▮▮▮▮ complaint and investigation?
```

```
 1        A.    Specifics -- that's a pretty broad question.
 2   Can you be more specific?
 3        Q.    You can tell me generally what you recall
 4   discussing with her about the investigation or about the
 5   complaint.
 6             THE WITNESS:  Is that my attorney-client
 7   privilege?
 8             MR. SULLIVAN:  Well, you can discuss -- not to
 9   the extent that there's any legal advice.  To the extent
10   she was giving you factual updates, you can discuss that.
11   To the extent you were asking for or receiving legal
12   advice from her, then I would instruct you not to
13   answer.
14             THE WITNESS:  Uh-huh.  So say the question
15   again, sir?
16   BY MR. RADI:
17        Q.    Sure.  What did you discuss with Ms. Donovan
18   about the Farewell complaint and investigation?
19             MR. SULLIVAN:  Again, just for the record, I'll
20   make it clear, I'm objecting to the extent it calls for
21   attorney-client privileged communication.  So I'd
22   instruct you not to answer to the extent that Ms. Donovan
23   was providing you with legal advice or you were
24   soliciting legal advice; to the extent that she was
25   providing you with factual updates --
```

```
 1              THE WITNESS:  Yeah.

 2              MR. SULLIVAN:  -- you can answer.

 3              THE WITNESS:  As I stated earlier, my concern

 4    was around the Quality Assurance Office being new, being

 5    an office that was functioning well.  And since Carmina

 6    reported to Andra, and the concerns that I heard from

 7    Mr. ██████ were about how difficult it was to have this

 8    complaint, and he was not satisfied with the level of

 9    support he was getting from Quality Assurance, that was

10    of concern to me.

11              So my conversations with Andra were about, "Is

12    this office working the way it is, the way I want it to

13    work?"  I wanted "Nordstrom" quality service.  I didn't

14    want a parent to have to make five phone calls to get a

15    concern met.  And it seemed that these parents were

16    continued -- continued to be upset.

17              And so I was talking -- most of my conversations

18    with Andra were about, "Why are they still upset if we

19    are" -- "made the conclusions?  Is this finished?  How

20    long is it going to take?  Are you coaching Carmina on

21    this, because Carmina is reporting to you?"

22              And then I remember a conversation, I think,

23    around Carmina was on vacation, and there was a meeting

24    with the ██████ and Andra went to the meeting.  And I

25    wanted to hear how that meeting went.  And so then she
```

```
 1    gave me an update afterwards around that meeting.
 2           Those are the kinds of conversation that I had
 3    with her.
 4    BY MR. RADI:
 5        Q.   And what did Ms. Donovan say to you during those
 6    conversations, to the extent it's not legal advice?
 7           MR. SULLIVAN:  Objection.  Overbroad.
 8           THE WITNESS:  That, I don't remember.
 9    BY MR. RADI:
10        Q.   You don't remember anything that she said to you
11    about the █████████ complaint during the investigation?
12        A.   There's a lot of detail, and I wouldn't
13    specifically remember.
14        Q.   But, generally, do you remember what she said to
15    you?
16        A.   Not really.
17        Q.   Do you remember anything she said to you?
18        A.   You could -- ask some more specific questions --
19    you might recall something -- but I'm not, like off the
20    top of my head, remembering something, no.
21        Q.   So off the top of your head right now, you can't
22    remember one word Ms. Donovan said to you about the
23    █████████ complaint?
24        A.   I just said a whole bunch of things.
25        Q.   Well, you said what you discussed with her, so
```

1    what did she say?

2        A.    I really don't remember.

3        Q.    Okay.  Did you ever discuss with Ms. Donovan

4    whether the underlying issue relating to the ████████

5    complaint, meaning the incident in the bathroom between

6    the boys, should be deemed sexual harassment or sexual

7    assault, or something else?

8        A.    I don't remember discussing that with her.

9        Q.    Do you remember Ms. Donovan ever telling you

10   that she believed the incident did not constitute sexual

11   harassment?

12       A.    I don't remember her saying that.

13       Q.    Did you ever say to her that you believed the

14   incident did not constitute sexual harassment?

15       A.    No.

16       Q.    In your conversations with Ms. Duran about the

17   ████████ complaint and investigation, what do you remember

18   discussing?

19       A.    With Ms. Duran?

20       Q.    Yes.

21       A.    I don't remember discussing it with her.

22       Q.    You said earlier that you think you had at least

23   a conversation --

24       A.    I may have, but I don't remember what we talked

25   about.

Deposition of Cindy Marten                                    GURRIERI vs. DURAN, et al.

1          Q.    Do you remember anything that she ever said to

2     you, Ms. Duran, about the ▮▮▮▮▮ complaint or

3     investigation?

4          A.    Not specifically.

5          Q.    How about generally?

6          A.    The general gist of our conversation I would

7     have had with her would have been around that Mr. ▮▮▮▮▮

8     was still upset and would she -- was -- why was he still

9     upset, and is there anything -- support that she needed

10    to be able to finish and have resolution for a family

11    that seemed upset.

12         Q.    When did you first communicate with Ms. Donovan

13    about the ▮▮▮▮▮ complaint?

14         A.    I don't remember.

15         Q.    Was it around the time that the complaint was

16    first made?

17         A.    I really don't know.

18         Q.    Do you remember the first time you discussed the

19    complaint with Ms. Duran?

20         A.    No.

21         Q.    Do you know if it was around the time the

22    complaint was made?

23         A.    I don't know.

24         Q.    Did you ever discuss the ▮▮▮▮▮ complaint with

25    Dr. Ferguson?

1      A.    I don't think so.

2      Q.    Did you ever meet with Dr. Ferguson about the

3   █████████ complaint?

4      A.    I don't believe so.

5      Q.    Did you ever communicate with him in writing

6   about the █████████ complaint?

7      A.    Not that I recall.

8      Q.    Did you ever have any conversations or meetings

9   with the █████████ about their complaint?

10     A.    I had a meeting with them, yes.

11     Q.    One?  Just one?

12     A.    I think it was only one meeting.  I don't

13  remember.

14     Q.    Do you remember when that happened -- meeting

15  happened?

16     A.    No, I don't remember.

17     Q.    Do you remember if it was around the time that

18  they made the complaint or later on in the investigation?

19     A.    I don't remember.  It probably wasn't at the

20  beginning when they made the complaint, but I actually

21  don't remember the timing.  I don't know the dates of

22  when the complaint was made, the investigation, the

23  timing of that.  I just know that there was a meeting

24  with them.

25     Q.    When a parent makes a complaint of this nature,

1   meaning, complaint that a principal failed to

2   appropriately respond to an incidence of -- a sexual

3   incident between kindergarten boys in the bathroom during

4   a school day, is that something that you think -- that

5   you would want brought to your attention as soon as the

6   District learns about it?

7           MR. SULLIVAN:  Objection.  Vague and ambiguous;

8   incomplete hypothetical.

9   BY MR. RADI:

10      Q.   You can answer.

11      A.   There's a lot in your question, even the

12   definition of a sexual incident, whether it was or wasn't

13   a sexual incident --

14      Q.   Okay.

15      A.   -- the timing of it.  There's -- there's -- if

16   you could break it down for me, maybe.

17      Q.   Well, this ███████ incident, do you expect

18   incidents like that to be brought to your attention?

19      A.   No.

20      Q.   Why not?

21      A.   Not every incident in the District is brought to

22   the superintendent's attention.  That's why I have the

23   Quality Assurance Office; that's why I have area

24   superintendents and other people to work -- and

25   principals to work with families.

Deposition of Cindy Marten                                    GURRIERI vs. DURAN, et al.

1      Q.   So you didn't think it was important or serious

2   enough to be brought to your attention?

3           MR. SULLIVAN:  Objection.  Misstates the

4   witness' testimony.

5   BY MR. RADI:

6      Q.   It's a question.  You can answer.

7      A.   Not everything is brought to my attention.

8      Q.   Okay.  Do you think that this was important

9   enough to be brought to your attention?

10     A.   I already answered what I was concerned about

11  with this case.  I was concerned about Quality Assurance

12  Office functioning at a high level.

13     Q.   Okay.  But that's not --

14     A.   And that's why --

15     Q.   -- answering my question.

16     A.   -- that's why I was concerned about it.  It was

17  brought to my attention for that reason.

18     Q.   Okay.  So I'm just asking you, yes or no, do

19  you think this case was important enough to be brought to

20  your attention?

21          MR. SULLIVAN:  Objection.  Asked and answered.

22  I'm instructing her not to answer the question.  She's

23  already answered your question.  You're not entitled to a

24  yes or no.

25          MR. RADI:  Well, I'm moving to strike the answer

1    as nonresponsive, and we'll mark it for a ruling later

2    on.

3    BY MR. RADI:

4        Q.   Do you remember what you discussed with the

5    ███████████   during the meeting?

6        A.   I have some ideas of what we may have discussed.

7    I don't have specific details.

8        Q.   Tell me generally what you recall discussing

9    during the meeting with the ███████████

10       A.   My interest in the meeting, which would be the

11   content of the discussion, was their experience in making

12   the report to Quality Assurance so that I could learn

13   whether -- whether the office was working in the way I

14   had imagined.  And so I got feedback from them about

15   reporting and what it took to report.

16            And they were concerned that they were given the

17   runaround, and that we were too big of a bureaucracy, and

18   they weren't getting timely answers.  And so I wanted

19   that feedback as a way for our system to improve.

20            So the content of what we discussed was around

21   the functioning of the office, as a kind of a 360, when

22   you do something, you want feedback if it's working or

23   not.  And I wanted direct and honest feedback from a

24   family that was dissatisfied with our service.

25            I'm about -- I would like a hundred percent

```
 1    customer satisfaction.  And this, I -- I deemed the

 2    ███████s to be a family who was not satisfied with the

 3    service that they received from an office that I opened.

 4    So the content of the conversation was around -- was

 5    around that.

 6         Q.   Who else was at the meeting?

 7         A.   I don't remember.  I think there -- it was

 8    Mr. and Mrs. ████████.  I remember them being there.  And

 9    I don't remember who else I for sure had there.

10         Q.   Do you remember anything that you said during

11    the meeting?

12         A.   Not specifically, no.

13         Q.   Do you remember anything else that the ████████

14    said during the meeting?

15         A.   I know that they were very upset about the

16    process; so they spoke about how upset they were around

17    the service that we provided; but the details, I don't

18    remember.

19         Q.   Did you have any other conversations with the

20    Farwells?

21              MR. SULLIVAN:  Other than this meeting, is that

22    what you're saying?

23              MR. RADI:  Yeah.  That's what I said, any other.

24    Other than at the meeting.

25              THE WITNESS:  I'm not sure.
```

Deposition of Cindy Marten                              GURRIERI vs. DURAN, et al.

```
 1    BY MR. RADI:
 2         Q.    Do you recall ever speaking to the ███████ on
 3    the phone, either Mr. or Mrs. ███████
 4         A.    I don't think so, but I'm not positive.
 5         Q.    Do you know if you ever communicated with either
 6    of the ███████ through email or any other writings?
 7         A.    I know Mr. ███████ wrote to me frequently.   I
 8    don't remember if I responded.
 9         Q.    Do you remember what he wrote to you?
10         A.    Not specifically.   He had -- it was details.
11    The things that I remember about, the tone of his email,
12    was reading -- reading it with the lens of this parent
13    seems like they're getting the runaround from the
14    District, and I don't want that.
15         Q.    Did you discuss that with Ms. Duran?
16         A.    I already answered that.   I discussed it with
17    Ms. Donovan.
18         Q.    Okay.   Did you discuss it with Ms. Duran, the
19    Far- --
20         A.    I don't think so.
21         Q.    -- the ███████ concerns?
22         A.    I may have.
23         Q.    When did you first meet Dr. Ferguson?
24         A.    I don't remember.
25         Q.    Did you meet him prior to becoming
```

1    superintendent?

2        A.   No, I don't think so.

3        Q.   What type of relationship do you have with

4    Dr. Ferguson?

5            MR. SULLIVAN:  Objection.  Vague and

6    ambiguous.

7            THE WITNESS:  He was one of 200 principals that

8    we have in the District, and I knew him professionally

9    very vaguely.

10   BY MR. RADI:

11       Q.   Do you have any personal relationship with him?

12       A.   No.

13       Q.   Were you ever aware of Dr. Ferguson taking a

14   leave of absence as principal?

15       A.   I may have been aware of that.

16       Q.   Do you know how many leave of absences?

17       A.   No.

18       Q.   Do you know why he took a leave of absence?

19       A.   I would be guessing.  I think it had something

20   to do with medical, but I'm not positive.

21       Q.   Do you know whether staff at Dr. Ferguson's

22   school ever took a vote of no confidence?

23       A.   No, I don't remember that.

24       Q.   Did you ever hear that?

25       A.   I don't think so.

1      Q.    Did you recommend Andra Donovan's appointment as

2   general counsel?

3      A.    Yes.

4      Q.    Why?

5      A.    She had served as deputy general counsel, and in

6   my assessment of what we needed in general counsel, she

7   was my recommendation.

8      Q.    You feel her to be a competent lawyer?

9      A.    Yes.

10     Q.    Do you rely on her legal interpretations?

11     A.    Yes.

12     Q.    Do you feel Carmina Duran was competent for the

13   position of executive director?

14     A.    Yes.

15     Q.    Do you know whether she was an investigator

16   prior to becoming executive director?

17     A.    I believe she was, but I don't know

18   specifically.  I think that was part of her background.

19     Q.    Did you deem her to be a competent investigator?

20     A.    Yes.

21     Q.    What type of relationship do you have with

22   Ms. Donovan?

23     A.    Professional.

24     Q.    Do you have a personal relationship with her?

25     A.    No.

```
 1          Q.    What type of relationship do you have with
 2     Ms. Duran?
 3          A.    Professional.
 4          Q.    Do you have a personal relationship with her?
 5          A.    No.
 6          Q.    Do you consider Ms. Donovan one of your friends?
 7          A.    No.
 8          Q.    Do you consider Ms. Duran one of your friends?
 9          A.    No.
10          Q.    Do you consider Dr. Ferguson one of your
11     friends?
12          A.    No.
13          Q.    Do you recall making the decision to retain
14     Dr. Ferguson as employee of the School District after the
15     ███████ complaint was filed?
16          MR. SULLIVAN:  Objection.  Vague and ambiguous;
17     assumes facts.
18          THE WITNESS:  Making a decision to retain, there
19     was -- give me more detail what you're wanting to find
20     out here.
21     BY MR. RADI:
22          Q.    Did you ever -- after the ██████ complaint was
23     filed, did you ever decide whether or not Dr. Ferguson
24     should be retained as a District employee?
25          A.    I'm sorry.  You're con- -- I already said I
```

```
 1   don't remember when the ████████ complaint was filed.  And

 2   so you're saying, did I do this after this?  I don't

 3   have -- I don't have a sense of the timing of that.

 4        Q.   Is there ever a time where you made a decision

 5   to retain Dr. Ferguson as an employee in response to the

 6   ████████ complaint?

 7             MR. SULLIVAN:  Objection.  Vague and ambiguous;

 8   assume facts.

 9   BY MR. RADI:

10        Q.   You can answer.

11        A.   I don't know how to answer that.

12        Q.   So you don't know?

13        A.   No.

14        Q.   Did the ████████ ever complain to you that they

15   did not want Dr. Ferguson to be the principal of Green

16   Elementary?

17        A.   Yes.

18        Q.   And did you tell them that he would return as

19   principal of Green Elementary?

20        A.   Not in those words.

21        Q.   What words did you use?

22        A.   He is the principal of Green Elementary.

23        Q.   Did you tell them --

24        A.   You're assuming that he would return; that he

25   was already gone.  He was not gone as principal.
```

Deposition of Cindy Marten                                    GURRIERI vs. DURAN, et al.

```
 1        Q.    Did you tell the ███████ that Dr. Ferguson
 2    would remain principal of Green Elementary?
 3        A.    Yes.
 4        Q.    When did you tell them that?
 5        A.    I don't remember.
 6        Q.    Was that in the meeting with the ██████
 7        A.    May have been.
 8        Q.    Why did you tell the ██████ that Dr. Ferguson
 9    would remain principal?
10        A.    I think that was a direct question they
11    probably -- they may have asked me, may have been in that
12    meeting, and I answered it.
13        Q.    Why did you decide that Dr. Ferguson would
14    remain principal?
15        A.    Many factors go into those decisions.
16        Q.    And I'm asking why.  Tell me the factors.
17        A.    He was the principal of the school at that
18    moment, and that was the answer -- they asked me, and I
19    answered it.  I needed to find out more information.  I
20    wasn't going to remove a principal based on a question a
21    parent asked me.
22        Q.    At the time you told the ██████ Dr. Ferguson
23    would remain principal, you intended for him to remain
24    principal?
25              MR. SULLIVAN:  Objection.  Vague and ambiguous.
```

```
 1              THE WITNESS:  They asked a direct question; I
 2    gave a direct answer with the facts that I had at that
 3    point.
 4    BY MR. RADI:
 5        Q.   So at that moment, you wanted Dr. Ferguson to
 6    remain the principal of Green Elementary?
 7        A.   Yes.
 8        Q.   Why?
 9        A.   I don't remember.
10        Q.   Did you tell Ms. Donovan that Dr. Ferguson would
11    remain principal of Green Elementary?
12        A.   I don't remember.
13        Q.   Did you tell Carmina Duran that Dr. Ferguson
14    would remain principal at Green Elementary?
15        A.   I don't remember.
16        Q.   Did you tell --
17        A.   I may have.
18        Q.   Is it possible you told Ms. Donovan, also?
19        A.   I may have.  She may have been in that meeting.
20    That may have been where that conversation happened.
21        Q.   Did you ever tell Dr. Ferguson that you wanted
22    him to remain principal of Green Elementary?
23        A.   I don't remember.
24        Q.   Did you ever tell Mike Gurrieri that you wanted
25    Dr. Ferguson to remain principal of Green Elementary?
```

1        A.    No.

2        Q.    Did you tell anybody else that you wanted

3   Dr. Ferguson to remain principal of Green Elementary?

4        A.    Not that I remember.

5        Q.    At the time that you told the ███████ you

6   wanted Dr. Ferguson to remain principal of Green

7   Elementary, was the investigation of the ███████

8   complaint still pending?

9        A.    I don't know.

10       Q.    Had it been completed?

11       A.    I don't know.

12       Q.    Did you know at the time if the investigation

13  was still pending?

14       A.    I don't know.  I didn't --

15            THE REPORTER:  I'm sorry?

16            THE WITNESS:  I didn't know the status of it.

17  BY MR. RADI:

18       Q.    Did you ask Ms. Donovan or Ms. Duran the status

19  of the investigation at the time you told the ███████

20  that you -- that Dr. Ferguson would remain principal?

21       A.    I don't remember.

22       Q.    Did it matter to you whether the investigation

23  was still pending at the time you told the ███████

24  Dr. Ferguson would remain principal?

25       A.    No.

1    Q.   Why not?

2    A.   It wasn't part of my decision-making at that

3    moment.

4    Q.   Do you think it would have been better to have

5    more information regarding the ███████ complaint about

6    Dr. Ferguson's inability or to -- withdrawn.

7         Did you feel that it was -- would have been

8    beneficial to have more information regarding the

9    ███████ complaints about Dr. Ferguson before you told

10   them that he would remain as principal?

11   A.   No.

12   Q.   Why not?

13   A.   Parents don't make decisions about a principal's

14   assignment or reassignment; I do.  They -- if they -- if

15   any parent were to demand a principal remain or be

16   removed, I would simply answer a simple question to the

17   parents, but more details are for me and my personnel

18   team to investigate, not for a parent.  And that would be

19   a personnel decision that I would make using much more

20   information than is being told to me in one meeting with

21   a parent demanding a removal.

22   Q.   Was the ███████ complaint about Dr. Ferguson

23   that he didn't follow District policies and that his

24   failure to do so created an unsafe environment for the

25   students?

1     A.    I don't know all of the details.   Those were

2   probably some of the details, yes.

3     Q.    Do you feel that it would have been beneficial

4   to have information on whether those allegations were

5   substantiated prior to telling the Farwells that

6   Dr. Ferguson would remain in his position?

7     A.    No.

8     Q.    Why not?

9     A.    I make personnel decisions not in the meeting

10  with the parent.   So if emphatically I said to the

11  parents what I knew at that moment, I answered their

12  question that they asked me, I'm sure.

13    Q.    In making the decision to keep Dr. Ferguson in

14  his position, would it have been beneficial to have --

15  withdrawn.

16        In making your decision to keep Dr. Ferguson in

17  his position as principal, would -- withdrawn.

18        Were you --

19        MR. SULLIVAN:   Before you ask a question, since

20  you withdrew that, let's take a short break, since

21  there's no question pending.

22        MR. RADI:   Okay.

23        (Recess taken 10:45 a.m. to 10:49 a.m.)

24        MR. RADI:   Back on the record.

25  /////

 1   BY MR. RADI:

 2       Q.   Do you think it would have been good to have the

 3   full benefit of all the information gathered during the

 4   investigation of the ████████ complaint prior to informing

 5   the Farwells of your decision to keep Dr. Ferguson in his

 6   position?

 7       A.   Well, all -- information is always valuable.

 8   That decision that that -- that was a moment in time when

 9   I answered a question.  It wasn't a final decision.  It

10   wasn't the end result of what I was going -- what was

11   going to happen at that school, but it was a point in

12   time.  So I always will take more information, and there

13   clearly was more I needed to know.

14       Q.   Did your decision to keep Dr. Ferguson in his

15   position change as a result of the investigation?

16       A.   No.

17       Q.   Was Dr. Ferguson assigned a mentor?

18       A.   Yes.

19       Q.   Whose decision was that?

20       A.   That decision was made with his direct

21   supervisor and a conversation she and I -- and I believe

22   Andra may have been part of that conversation, too, but I

23   don't remember.

24       Q.   Which --

25       A.   It would have been his supervisor that assigns a

Deposition of Cindy Marten                                    GURRIERI vs. DURAN, et al.

1    mentor.

2        Q.    What was discussed during that conversation?

3        A.    We wanted to make sure he had support.

4        Q.    Why?

5        A.    As the investigation was pending around

6    supervision of students, make sure he's having proper

7    guidance and support to make sure the students are

8    properly supervised and he's following up on issues, such

9    as the one we learned about in the ███████ case, or any

10   other issues that require a principal's attention.

11       Q.    Do you know whether Dr. Ferguson was having

12   personal issues at the time of the incident in the

13   bathroom with the ███████ boy or during the time of the

14   investigation of that complaint?

15            MR. SULLIVAN:   Objection.   Compound; vague and

16   ambiguous.

17            THE WITNESS:   I'm not certain of his personal --

18   what did you call them? -- issues.   I'm not certain.

19   BY MR. RADI:

20       Q.    At the time when you told the ███████ that

21   Dr. Ferguson would remain in his position, were you aware

22   of any other incidents involving sexual abuse or

23   harassment amongst elementary school students at Green?

24       A.    I don't remember.

25       Q.    Would that have made a difference in your --

Deposition of Cindy Marten                                    GURRIERI vs. DURAN, et al.

```
1    what you told the ████████ about Dr. Ferguson remaining

2    in his position?

3              MR. SULLIVAN:  Objection.  Incomplete

4    hypothetical; assumes facts.

5              THE WITNESS:  I don't know.

6    BY MR. RADI:

7         Q.   What was your answer?

8         A.   I don't know.  It would depend.

9         Q.   What would that depend on?

10        A.   Very broad set of information.  I was -- it was

11   a point in time when I answered the question.

12        Q.   At the time you discussed this with -- you

13   discussed Dr. Ferguson's employment with the ████████

14   were you aware of allegations that he was abusing alcohol

15   during the school day; that Dr. Ferguson was abusing

16   alcohol during the school day?

17        A.   No.

18        Q.   At the time you discussed Dr. Ferguson's

19   employment with the ████████ were you aware of

20   allegations that Dr. Ferguson was frequently absent from

21   school and failed to properly respond to incidents --

22   sexual incidents between students?

23        A.   I'm not sure what I was aware of at that moment,

24   and when I learned of certain things.

25        Q.   Do you feel that those are allegations that
```

1    should have been investigated; meaning, allegations of

2    Dr. Ferguson abusing alcohol during the school day and

3    not properly performing his duties as principal?

4         A.    Allegations of that nature, of course, should be

5    investigated.

6         Q.    Do you believe allegations that the principal

7    failed to respond to other incidents similar to the

8    ███████ incident should be investigated?

9         A.    Yes.

10        Q.    Did you see any of the reports or drafts of

11   reports that were drafted by Mike Gurrieri with regard to

12   the ██████ complaint?

13        A.    I don't believe so.

14             Can I clarify what you said, one question back,

15   when you said "should be investigated"?  You probably

16   should clarify what you mean by "investigation."

17        Q.    Okay.  Have you ever seen Exhibit 49?

18             THE WITNESS:  Am I going to clarify -- I want to

19   clarify something I said.

20             MR. SULLIVAN:  No.  That's okay.

21             THE WITNESS:  No?  Okay.

22             MR. SULLIVAN:  You made your point to clarify

23   what was asked.

24             THE WITNESS:  Okay.

25   /////

1    BY MR. RADI:

2         Q.    Just tell me if you have ever seen that

3    before -- before today.   It's a 34-page document

4    regarding investigation of the ██████ complaint.

5         A.    No.

6         Q.    Okay.   Thank you.

7              I'd like to show you Exhibit 50, which is a

8    report dated September 17th, 2014, regarding the ███████

9    investigation that was issued to the ██████

10             Tell me if you have ever seen that report before

11   today.

12        A.    No, I don't think so.

13        Q.    Have you ever seen Exhibit 46 prior to today,

14   which is a report dated October 10th, 2014, regarding the

15   ██████ complaint that was issued to the ███████

16        A.    Is this the same as that?

17        Q.    You can --

18        A.    No.   I mean -- no, I don't recognize any of

19   these, but --

20        Q.    Okay.

21        A.    -- it sounded like the same thing when you

22   described them.

23        Q.    Do you recall anyone ever providing you with

24   copies of either of these three reports?

25        A.    No, I don't recall.

Deposition of Cindy Marten                                      GURRIERI vs. DURAN, et al.

1       Q.   Did you ever discuss any of these reports with

2   Carmina Duran?

3       A.   I don't recall.  I may have.

4       Q.   Do you recall what you may have said during

5   any --

6       A.   No.

7       Q.   -- discussion you may have had?

8       A.   No.

9       Q.   Do you recall discussing any of these reports

10  with Ms. Donovan?

11      A.   I may have.

12      Q.   Do you recall what you may have discussed?

13      A.   No.

14      Q.   Were you ever told or did you ever learn that

15  Exhibit 49 referred to allegations of other -- other

16  sexual incidents involving elementary school students

17  during Dr. Ferguson's tenure?

18          MR. SULLIVAN:  Objection.  Misstates the

19  testimony.

20  BY MR. RADI:

21      Q.   You can answer.

22      A.   I don't know.

23      Q.   You don't know, or no, it --

24      A.   I don't know -- say the question again.

25          MR. RADI:  Sure.  Can you read it back?

1              (Record read as follows:

2              "Question:  Were you ever told or did you

3        ever learn that Exhibit 49 referred to

4        allegations of or -- of other sexual incidents

5        involving elementary school students during

6        Dr. Ferguson's tenure?")

7              THE WITNESS:  I don't recall.

8    BY MR. RADI:

9        Q.   If Exhibit 49 did contain such allegations, do

10   you think this should have been further investigated by

11   Quality Assurance?

12             MR. SULLIVAN:  Objection.  Poses an incomplete

13   hypothetical; calls for speculation.

14   BY MR. RADI:

15       Q.   You can answer.

16       A.   Yeah, there's too much information there that

17   I'm unaware of to answer that.

18       Q.   What other information do you need to answer

19   that?

20       A.   I don't know.  I would have to speculate to

21   answer that question on facts that I have no knowledge

22   of.  I've never seen that report.  I don't know what's in

23   there.  I don't know what -- I would be speculating.

24       Q.   If an investigator during an investigation was

25   informed about other similar incidents to the one he's

```
 1    investigating, do you think they should be further

 2    investigated or followed up on?

 3             MR. SULLIVAN:  Objection.  Incomplete

 4    hypothetical; assumes facts not in evidence; calls for

 5    speculation.

 6             THE WITNESS:  I would be speculating to answer

 7    that question.

 8    BY MR. RADI:

 9        Q.   Do you know whether Carmina Duran or Andra

10    Donovan ever told Mike Gurrieri to remove allegations of

11    other sexual incidents between Green Elementary students

12    from any drafts of any of his reports that he did on the

13    Farwell investigation?

14        A.   No.

15        Q.   Do you think that that would be appropriate if

16    he was?

17             MR. SULLIVAN:  Objection.  Calls for speculation

18    and assumes facts not in evidence --

19    BY MR. RADI:

20        Q.   You can answer.

21             MR. SULLIVAN:  -- incomplete hypothetical.

22             THE WITNESS:  I would be speculating to answer

23    that.  It would depend on multiple factors.  I don't

24    know.

25    /////
```

 1    BY MR. RADI:

 2        Q.    I'm going to ask you to speculate.  What would

 3    it depend on?

 4        A.    I don't know.

 5        Q.    Did you ever instruct anybody or tell anybody,

 6    including Carmina, Andra Donovan, or Mike Gurrieri,

 7    that -- to remove things from any of the ████████

 8    investigation reports?

 9        A.    No.

10        Q.    Did you ever become aware that Mike Gurrieri

11    expressed his opinion that Bruce Ferguson should be

12    further investigated and possibly disciplined or fired?

13        A.    No.

14        Q.    Did you ever become aware that Mike Gurrieri was

15    told not to express that opinion to anybody?

16        MR. SULLIVAN:  Objection.  Assumes facts not in

17    evidence.

18        THE WITNESS:  That question is -- I already

19    answered the first question, that I would say, no, I

20    didn't know about that.

21    BY MR. RADI:

22        Q.    Do you think it would be appropriate to tell an

23    internal investigator not to express his opinion on the

24    discipline of an employee?

25        MR. SULLIVAN:  Objection.  Assumes facts --

```
 1    BY MR. RADI:

 2        Q.   You can answer.

 3             MR. SULLIVAN:  -- incomplete hypothetical.

 4             THE WITNESS:  It's a hypothetical question.  I

 5    couldn't answer that.

 6    BY MR. RADI:

 7        Q.   Did you ever become aware that Carmina Duran

 8    told Mike Gurrieri not to state to you his personal

 9    opinions if he met with you to discuss the ████████ case?

10        A.   No.

11        Q.   Do you think that's appropriate --

12             MR. SULLIVAN:  Objection.

13    BY MR. RADI:

14        Q.   -- an appropriate instruction?

15             MR. SULLIVAN:  Objection.  Incomplete

16    hypothetical.

17             THE WITNESS:  Once again, that's hypothetical.

18    I couldn't answer that.

19    BY MR. RADI:

20        Q.   I'm asking your opinion on if one of your

21    employees told another employee not to express an opinion

22    to you, do you think that is appropriate or not?

23        A.   You're asking me hypothetically.  You didn't ask

24    me hypothetically.  You specifically asked me if Carmina

25    said that to him.
```

1      Q.   And then I asked you this question, so what do

2    you -- do you think that would be appropriate if one

3    of your --

4      A.   Restate your question.

5      Q.   Do you think it would be appropriate for one of

6    your employees -- withdrawn.

7           Do you think it would be appropriate for one of

8    your supervisors to tell one of their employees not to

9    state their opinions to the superintendent?

10          MR. SULLIVAN:   Objection.   Incomplete

11   hypothetical.

12          THE WITNESS:   It would depend on multiple

13   factors.   Too broad of a question.

14   BY MR. RADI:

15     Q.   What would it depend on?

16     A.   Lots of different circumstances --

17     Q.   Such as?

18     A.   -- it's circumstantial.

19          Many different things could happen --

20     Q.   Tell me some.

21     A.   -- making that appropriate or not appropriate.

22          I don't know.

23     Q.   Do you know whether Andra Donovan ever told Mike

24   Gurrieri to draft his investigation report on the ▮▮▮▮

25   complaint to be consistent with your decision to keep

1    Bruce Ferguson?

2              MR. SULLIVAN:   Objection.   Lacks foundation;

3    assumes facts not in evidence.

4              MR. RADI:   It's not assuming.   I'm just asking

5    if she knows if that ever happened.

6    BY MR. RADI:

7         Q.   You can answer.

8         A.   I don't know.

9         Q.   Do you think that would be appropriate for

10   Ms. Donovan to instruct Mike Gurrieri to do?

11        A.   I don't know.

12        Q.   Do you know whether or not Mike Gurrieri

13   objected to removing -- withdrawn.

14             Are you aware of whether or not Mike Gurrieri

15   ever objected to or complained about being told to remove

16   allegations from his investigation reports on the ████████

17   complaint?

18        A.   No.

19        Q.   Did you ever tell Ms. Donovan that the ████████

20   investigation report should be drafted in a manner so as

21   to minimize Bruce Ferguson's negligence or culpability?

22        A.   No.

23        Q.   Did you ever say that to Ms. Duran?

24        A.   No.

25        Q.   Did you ever say that to Mike Gurrieri?

 1      A.    No.

 2      Q.    Did you ever say that to anybody?

 3      A.    No.

 4      Q.    Did you ever say anything similar to that to

 5   anybody?

 6      A.    No.

 7      Q.    Did you ever tell anybody that the ███████

 8   investigation report should be drafted in a way so as to

 9   avoid criticism to your decision to keep Bruce Ferguson?

10          MR. SULLIVAN:   Objection.   Assumes facts not in

11   evidence; misstates the testimony.

12   BY MR. RADI:

13      Q.    You can answer.

14          MR. SULLIVAN:   You can answer.

15          THE WITNESS:   No.   It's the same as the other

16   questions you just asked, no.

17   BY MR. RADI:

18      Q.    Are you familiar with the District's sexual

19   harassment policy?

20      A.    Yes.

21      Q.    Is it your understanding that it complies with

22   state law?

23      A.    Yes.

24      Q.    Is it your understanding it complies with

25   federal law?

1   A.   Yes.

2   Q.   Would allegations involving -- withdrawn.

3        Would a complaint that a kindergarten boy was

4   orally copulated in the bathroom on school grounds during

5   the school day constitute sexual harassment of the School

6   District's sexual harassment policy?

7        MR. SULLIVAN:  Objection.  Incomplete

8   hypothetical.

9   BY MR. RADI:

10  Q.   You can answer.

11  A.   Whether that act was an act that was --

12  Q.   Could it constitute sexual harassment under the

13  District's policy?

14  A.   I'm not certain.

15       MR. SULLIVAN:  Counsel, we're not going to go

16  through with the superintendent with the sexual

17  harassment policies and asking for legal opinions.

18  You've already had the opportunity to talk to the general

19  counsel about it, to the head of Quality Assurance.  It's

20  not an appropriate area of inquiry for an Apex

21  deposition.  So if you want to bring a motion on that,

22  you're welcome to do so.

23       MR. RADI:  Are you going to direct her not to

24  answer?

25       MR. SULLIVAN:  Yeah.  It's not -- she's already

```
 1    testified she has no knowledge with regard to anything
 2    specific with regard to that.  She's not an expert.  It's
 3    not an appropriate area of inquiry, so, yes.
 4            MR. RADI:  All right.  Well, I'm just going to
 5    ask my question for the record, and you can --
 6            MR. SULLIVAN:  I've made the record.  You can
 7    bring your motion on that.  It's clear that -- that your
 8    line of questions with regard to the sexual harassment
 9    policy and what it is or isn't appropriate in a
10    hypothetical situation.  If you have anything other than
11    that, other than asking her hypothetical questions about
12    the legal applicability or factual determination with
13    regard to sexual harassment, then you can answer those --
14    ask those questions.
15            MR. RADI:  Okay.  That's fine.
16            Well, I didn't ask the question yet that you're
17    objecting to.  So let me ask my question, and then you
18    state your objection, and either she will answer or she
19    won't, and that will be fine.
20            If I feel the need later on to make a motion,
21    then I will, but I need to ask the question for the
22    record.
23    BY MR. RADI:
24       Q.   Is it your opinion -- withdrawn.
25            What is your opinion on whether or not the
```

Deposition of Cindy Marten                                    GURRIERI vs. DURAN, et al.

1   incident that occurred with the ▇▇▇▇ boy in a Green

2   Elementary bathroom constituted an unwelcome sexual

3   advance?

4           MR. SULLIVAN:  If you have such an opinion.

5           THE WITNESS:  I don't know enough information to

6   answer that.

7   BY MR. RADI:

8       Q.   Do you know whether the incident involving the

9   ▇▇▇▇ boy and the other boy constituted a request for

10  sexual favors?

11      A.   I don't know enough information about what

12  transpired to answer that.

13      Q.   Do you know whether that incident constituted

14  physical conduct of a sexual nature made by someone in

15  the educational setting?

16      A.   Again, I don't know enough information about the

17  incident.

18      Q.   Would you trust your general counsel's opinion

19  that that incident did not constitute sexual harassment?

20          MR. SULLIVAN:  Objection.  Calls for

21  speculation; incomplete hypothetical.

22          THE WITNESS:  It's too many -- too many details

23  in that question.  I can't answer that.

24  BY MR. RADI:

25      Q.   Do you know whether your general counsel

1    determined that that incident did not constitute sexual

2    harassment?

3         A.    I believe she may have.

4         Q.    And you trust her decision?

5         A.    I want more details about that, but at the time,

6    I would have, yes.

7         Q.    Did you ever become aware that the Office of

8    Civil Rights investigated the District's response to the

9    ████████ complaint?

10        A.    I may have.

11        Q.    Were you involved in that investigation?

12        A.    I don't believe so.

13        Q.    Do you know if you were interviewed as part of

14   that investigation?

15        A.    No, I don't -- I don't think I was.  I don't

16   recall.

17        Q.    Were you ever aware that Ms. Donovan told OCR

18   that she guided the District's response to the ████████

19   complaint?

20        A.    I don't think so.

21        Q.    Are you aware that OCR found that Ms. Donovan

22   had made the wrong determination that the ████████

23   incident did not constitute sexual harassment?

24        A.    I may have been informed of that.

25        Q.    Are you aware that Ms. Donovan admitted that she

```
 1    had made a mistake in that regard?
 2         A.   Not specifically.
 3         Q.   In your opinion, do you find the District's
 4    sexual harassment policy to be vague at all?
 5              MR. SULLIVAN:  Objection.  Assumes facts that
 6    you -- she's read the document and formed an opinion.
 7              THE WITNESS:  I don't have enough concrete
 8    knowledge of it to answer that question.
 9    BY MR. RADI:
10         Q.   Do you know whether Bruce Ferguson would have
11    had to follow additional policies or procedures with
12    regard to the Farwell incident if it had been determined
13    that the incident constituted sexual harassment?
14         A.   I'm not sure.
15         Q.   Do you know the results of the Farwell
16    investigation?
17         A.   Not -- not specifically, but generally.
18         Q.   Are you aware that Bruce Ferguson -- withdrawn.
19              Are you aware that Bruce Ferguson was found not
20    to have violated any District policies in regard to the
21    Farwell incident?
22         A.   I seem to remember that those were the findings
23    of the report, but I don't know details.
24         Q.   Are you aware that the policy -- that if the
25    incident had been deemed to be sexual harassment, that
```

```
 1    Bruce Ferguson would have been in violation of the sexual

 2    harassment policy?

 3        A.    No.

 4        Q.    Are you aware that Ms. Donovan's decision to

 5    label the incident as not sexual harassment resulted in a

 6    finding that Bruce Ferguson did not violate any District

 7    policies?

 8             MR. SULLIVAN:   Objection.   Assumes facts not in

 9    evidence; misstates the testimony.

10    BY MR. RADI:

11        Q.    You can answer.

12        A.    I don't know.

13        Q.    Do you think it's important for elementary

14    school principals to follow District policies and

15    procedures and to apply them properly?

16             MR. SULLIVAN:   Objection.   Incomplete

17    hypothetical.

18             THE WITNESS:   It's a general question.

19    BY MR. RADI:

20        Q.    You don't think that's important?

21        A.    It's too general of a question.

22        Q.    What is general about it?

23        A.    I don't know.

24        Q.    Do you think there are District policies that

25    elementary school principals should not follow?
```

```
 1        A.    Policies are important to our District.

 2        Q.    And you expect them to be followed, correct?

 3        A.    Using professional judgment; in many cases,

 4   there's many layers of how to follow policies.

 5        Q.    They should be followed, or are there times when

 6   they should not be followed?

 7             MR. SULLIVAN:  Objection.  Asked and answered.

 8   BY MR. RADI:

 9        Q.    You can answer.

10        A.    Many different cases require professional

11   judgment for our principals to follow and to use their

12   own professional judgement within our policies, that they

13   understand them, and different decisions are made based

14   on facts, times, so it depends.

15        Q.    Do you believe it's important for elementary

16   school principals to follow the correct policies and

17   procedures in responding to incidents of sexual

18   harassment or sexual assault that occur on school grounds

19   during the school day?

20             MR. SULLIVAN:  Objection.  Incomplete

21   hypothetical.

22             THE WITNESS:  I don't know.

23   BY MR. RADI:

24        Q.    Do you think that the failure to follow District

25   policies regarding sexual harassment or sexual assault in
```

```
 1    the school could result in the creation of an unsafe

 2    environment for students?

 3            MR. SULLIVAN:  Objection.  Incomplete

 4    hypothetical.

 5            THE WITNESS:  I don't know.

 6    BY MR. RADI:

 7       Q.   Who in the District has responsibility for

 8    interpreting application of District policies and

 9    procedures?

10            MR. SULLIVAN:  Objection.  Lacks foundation;

11    vague and ambiguous.

12            THE WITNESS:  I don't know.

13    BY MR. RADI:

14       Q.   Is that part of general counsel's job?

15            MR. SULLIVAN:  Objection.  Incomplete

16    hypothetical; vague and ambiguous.

17            THE WITNESS:  I don't know.

18    BY MR. RADI:

19       Q.   Do you know what general counsel's job is?

20       A.   Generally, yes.

21       Q.   What is it?

22       A.   Represent the District.

23       Q.   Anything else?

24       A.   I have to -- we can pull the job description and

25    provide that to you, but I can't give you all the
```

1    details.

2       Q.   Nothing else that you can remember right now?

3       A.   No.

4       Q.   Do you know what the Quality Assurance Office's

5    internal investigator's job is?

6       A.   Not detailed, no.

7       Q.   Do you know generally?

8       A.   To investigate claims.

9       Q.   And is his job to make factual findings?

10      A.   I'm not sure.

11      Q.   Is his job to apply the facts --

12           MR. SULLIVAN:  Counsel, again, this is not

13   appropriate for an Apex deposition.  You have a job

14   description.  You'll be able to talk to his supervisor,

15   to his supervisor's supervisor.  It's not appropriate to

16   be quizzing the superintendent on job descriptions of

17   people that don't even report indirectly to her.

18           So if you can please move on to another subject,

19   or we'll -- if you don't have any other questions, we'll

20   terminate the deposition.

21           But I'm going to be happy to show this

22   transcript to a judge, and the fact that you're asking

23   Ms. Marten about hypothetical things with policies and

24   other people's job descriptions.

25           Go to something that is factual that relates

1   directly to this case and directly to the facts, or we'll

2   terminate the deposition.

3          MR. RADI:   I believe it does, but I do have

4   other questions.

5          MR. SULLIVAN:   Then why don't you go ahead and

6   ask the questions.

7          MR. RADI:   Are you telling her not to answer

8   this one?

9          MR. SULLIVAN:   No, I'm telling you to move on to

10  other questions or we'll terminate the deposition now and

11  show the transcript to the Judge.

12         MR. RADI:   I have no problem showing this

13  transcript to the Judge.

14  BY MR. RADI:

15     Q.   Would you expect general counsel to approve

16  the -- an internal investigator's findings and

17  conclusions in the application of District policy before

18  a public report is issued to the complainant?

19         MR. SULLIVAN:   Objection.   Incomplete

20  hypothetical.

21         THE WITNESS:   I'm not sure.

22  BY MR. RADI:

23     Q.   Do you expect the District's supervisory

24  employees to follow District policies regarding employee

25  evaluations?

Deposition of Cindy Marten                                  GURRIERI vs. DURAN, et al.

1       A.   As a general rule?

2       Q.   Yes.

3       A.   Yes.

4       Q.   Do you know if District policy requires

5    probationary classified employees to be provided a

6    written evaluation prior to termination?

7            MR. SULLIVAN:  Same issue.  Policies speak for

8    themselves.  You don't need to ask the superintendent

9    about what the policies provide.

10           MR. RADI:  I'm asking if she knows.

11           MR. SULLIVAN:  No, not a relevant question in

12   this case as to what she knows about policies when she

13   was their -- there's no evidence that she had any

14   involvement in the personnel decision at issue.

15           MR. RADI:  Well, that's what this deposition is

16   for, is to find out.

17           MR. SULLIVAN:  And you can ask -- you can ask

18   any question about what her involvement was, but not

19   about what she thinks of policies.

20   BY MR. RADI:

21      Q.   I'm asking, do you know what that policy is?

22           MR. SULLIVAN:  Yeah, no.  Instruct not to

23   answer.  Move to something factual that relates to this

24   case.

25           MR. RADI:  Mark that for a ruling, please.

KRAMM COURT REPORTING        Under Seal Pursuant to Protective Order        Page: 64

Deposition of Cindy Marten                                    GURRIERI vs. DURAN, et al.

1    BY MR. RADI:

2        Q.    Do you believe it's inappropriate to fire a

3    probationary employee prior to giving him a written

4    performance evaluation that's required by District

5    policy?

6            MR. SULLIVAN:   Objection.   Incomplete

7    hypothetical.

8            THE WITNESS:   I'm not sure.

9    BY MR. RADI:

10       Q.    Are you aware that Mike Gurrieri requested that

11   his supervisor, Carmina Duran, provide him with written

12   feedback on his performance so that he could improve

13   prior to being terminated?

14       A.    No.

15       Q.    Are you aware that Carmina Duran did not provide

16   Mr. Gurrieri with the requested written feedback on his

17   performance prior to terminating him?

18       A.    No.

19       Q.    Are you aware that Carmina Duran fired

20   Mr. Gurrieri the next morning after he'd requested

21   written feedback on his performance?

22       A.    No.

23       Q.    Do you think that would be appropriate?

24           MR. SULLIVAN:   Objection.   Incomplete

25   hypothetical; calls for speculation; lacks foundation.

1          THE WITNESS:  I don't know enough to be able to

2     answer that.

3     BY MR. RADI:

4          Q.   Are you aware that Mike Gurrieri was never

5     provided with any written performance evaluation prior to

6     his -- prior to being employed by the District for six

7     months or even after that?

8          A.   No.

9          Q.   Are you aware that Mr. Gurrieri was employed for

10    the District for more than six months?

11         A.   No.

12         Q.   Did you ever become aware that Mr. Gurrieri had

13    expressed his concern with District's hiring practices?

14         A.   No.

15         MR. SULLIVAN:  Objection.  Assumes facts not in

16    evidence.

17    BY MR. RADI:

18         Q.   Did you ever become aware that Mr. Gurrieri had

19    discussed District's hiring practices with other District

20    employees?

21         MR. SULLIVAN:  Objection.  Assumes facts not in

22    evidence.

23         THE WITNESS:  No.

24    BY MR. RADI:

25         Q.   Did you ever become aware that Mr. Gurrieri

1    believes, and he expressed his opinion, that the

2    District's Quality Assurance Office provided priority to

3    cases involving -- withdrawn.

4          Were you ever aware that Mr. Gurrieri complained

5    that the District's Quality Assurance Office's

6    investigation policies resulted in favorable treatment --

7    resulted in less favorable treatment to minorities?

8          MR. SULLIVAN:  Objection.  Assumes facts not in

9    evidence.

10   BY MR. RADI:

11       Q.   Did you ever hear that?

12       A.   No.

13       Q.   Were you ever aware that Mr. Gurrieri complained

14   that District policies were vague or outdated?

15       A.   No.

16       Q.   Do you think it's appropriate to terminate an

17   employee for objecting to remove allegations of sexual

18   incidents occurring in elementary schools from an

19   investigation report?

20         MR. SULLIVAN:  Objection.  Incomplete

21   hypothetical; assumes facts not in evidence.

22         THE WITNESS:  I don't know.

23   BY MR. RADI:

24       Q.   Did you ever become aware that Mr. Gurrieri was

25   terminated for the position of internal investigator?

1           MR. SULLIVAN:  Objection.  Vague as to time.

2           MR. RADI:  Ever.

3           THE WITNESS:  Yeah, I'm not sure.

4           MR. SULLIVAN:  You mean prior to the lawsuit?

5           MR. RADI:  Yeah, prior to the lawsuit.

6           THE WITNESS:  No.

7    BY MR. RADI:

8       Q.   Did you ever have any discussions with anybody

9    about Mr. Gurrieri's termination from his probationary

10   employment prior to the filing of this lawsuit?

11      A.   No.

12      Q.   Prior to Mr. Gurrieri's termination, did you

13   ever discuss his performance with Carmina Duran or Andra

14   Donovan?

15      A.   No.

16      Q.   Did Andra Donovan or Carmina Duran ever discuss

17   with you the possibility of terminating Mr. Gurrieri

18   prior to his termination?

19      A.   I don't think so.

20      Q.   When did you first learn Mr. Gurrieri was

21   terminated?

22      A.   I'm not sure.

23      Q.   Was it prior to this lawsuit?

24      A.   I don't think so.

25      Q.   Are you aware that at the time Mr. Gurrieri was

1    terminated, he was the only internal investigator for the

2    Quality Assurance Office?

3         A.   No.

4         Q.   Were you ever made aware of any performance

5    issues regarding Mr. Gurrieri?

6         A.   No.

7         Q.   Did you ever hear any negative feedback or

8    complaints about Mr. Gurrieri by anybody?

9         A.   I don't think so.

10        Q.   Did you ever have any complaints about

11   Mr. Gurrieri?

12        A.   No.

13        Q.   Did you approve Mr. Gurrieri's termination?

14        A.   I don't think so.

15        Q.   What is a superintendent's --

16             THE REPORTER:  I'm sorry.  Say that again?

17   BY MR. RADI:

18        Q.   -- superintendent's Consent Agenda?  Can you

19   describe what that is, explain what that is?

20             MR. SULLIVAN:  Do you know what that is?

21             THE WITNESS:  Yeah, sort of.

22   BY MR. RADI:

23        Q.   Explain it as best you can.

24        A.   It's a procedural document.  At board meetings,

25   we have Consent Agenda.

Deposition of Cindy Marten                                    GURRIERI vs. DURAN, et al.

1          The reason why I asked, if I approved his

2    termination, when I said, "I don't think so," it may have

3    been -- we have 17,000 employees, and terminations,

4    resignations, there's five or six different classes of

5    things that go on Consent Agenda from Personnel.

6          So the Personnel Department would bring

7    charged -- allegations, charges, something for -- that

8    comes through Personnel through their supervisors, and

9    goes through the Board.  So it may have been on there,

10   which would mean that I may have known about it because

11   it goes through.  But I don't -- they're not -- I don't

12   bring those forward.  They're brought forward through

13   Personnel.

14      Q.    And does the superintendent approve those

15   Consent Agendas?

16      A.    They're brought forward through my office, but

17   they're recommendations from staff.

18      Q.    Who approves it?  Is it the superintendent --

19      A.    The Board.

20      Q.    -- the Board?

21      A.    The Board.

22      Q.    And does the superintendent recommend Consent

23   Agendas' approval to the Board?

24      A.    Yes.

25          MR. RADI:  I have one exhibit.  It's

KRAMM COURT REPORTING        Under Seal Pursuant to Protective Order        Page: 70

```
 1   Exhibit 53.

 2           MR. SULLIVAN:  Is that a new one?

 3           MR. RADI:  Yeah.

 4           (Exhibit 53 marked for identification.)

 5           THE WITNESS:  Yeah.  This is the personnel --

 6           MR. SULLIVAN:  Have you got one for me?

 7           MR. RADI:  I don't have an extra one.  You can

 8   use mine for now.  I assume you'll keep the originals.

 9           THE WITNESS:  Yeah.

10   BY MR. RADI:

11      Q.   Do you know what this document is?

12      A.   Generally.  I'll review it in a little bit more

13   detail.

14      Q.   Okay.  Take your time to review it.  Let me know

15   when you're done.

16      A.   That's what I explained to you; the Consent

17   Agenda brought forward by Personnel.

18      Q.   Did you recommend this Consent Agenda to the

19   Board?

20      A.   As a matter of procedure, yes.

21      Q.   Was it approved by the Board?

22      A.   I don't know.  I assume it was, but I would have

23   to look at the record.

24      Q.   Is there anything on this document showing

25   whether or not it was approved by the Board?
```

Deposition of Cindy Marten                                    GURRIERI vs. DURAN, et al.

```
 1        A.    No.   It would be in the Board action items.

 2        Q.    Does this Consent Agenda recommend the

 3   termination of Mike Gurrieri?

 4        A.    I don't know.

 5        Q.    Take your time and look.

 6              And I will represent that the attachment to the

 7   Consent Agenda is not the complete attachment.   It's just

 8   relevant motions.

 9        A.    This item includes what I was saying earlier,

10   hires, rehires, promotions, transfers, termination, pay

11   rate changes, and assignment changes.   So a Consent

12   Agenda of this nature, it's a ratification.   These things

13   have already occurred.

14              And so Personnel, as a matter of business, is

15   continually hiring, rehiring, promoting, transferring,

16   terminating, changing people's pay rates, and

17   assigning -- making changes in their assignments on an

18   ongoing basis.

19              And as a matter of business, with a large

20   organization such as ours, that happens on a continuous

21   basis, and we bring the information to the Board to

22   ratify actions that have happened.   So this is a summary

23   of actions that have happened for Board ratification.

24              And your specific question about Gurrieri, what

25   was your question about him?
```

1              MR. RADI:  Move to strike, nonresponsive to the

2      question.

3      BY MR. RADI:

4          Q.    The question was, does this Consent Agenda

5      approve the termination of Mike Gurrieri?

6              MR. SULLIVAN:  Objection.  Asked and answered.

7              THE WITNESS:  I'm not sure.  I see his name on

8      here, and I'm just having to read:  Probationary, "PRO"

9      is probationary --

10             THE REPORTER:  I'm sorry.  Say that again?

11             THE WITNESS:  I'm reading the report.  And I see

12     his name on the report.  And I see that he's listed as a

13     probationary employee with the letters "PRO."  I believe

14     that initials P-R-O means probationary, and the letters

15     T-E-R, I believe to mean terminate.  But we -- you don't

16     have the rest of it here to confirm that that is what it

17     means.

18     BY MR. RADI:

19         Q.    The rest of what?

20         A.    What the codes mean.

21         Q.    Okay.

22         A.    I'm assuming "TER" means terminating.  And

23     that's what this is recommending.  It was a ratification

24     of the decision to terminate Mr. Gurrieri.

25         Q.    Was Dr. Ferguson ever reassigned from his

1   position as principal?

2           MR. SULLIVAN:  That's fine.

3           MR. RADI:  You can have the original one.

4           MR. SULLIVAN:  No, the court reporter gets that.

5           MR. RADI:  Okay.  You can make another copy.

6           MR. SULLIVAN:  Okay.  I'll take it and make a

7   copy.

8           MR. RADI:  Okay.  Thanks.

9   BY MR. RADI:

10      Q.   Was Dr. Ferguson reassigned from principal?

11      A.   I believe so.

12      Q.   When was that?

13      A.   I don't know.

14      Q.   Where was he reassigned to?

15      A.   I believe he was reassigned to the Office Of

16  Language Acquisition.

17      Q.   What position?

18      A.   I'm not sure.

19      Q.   Is he still in that position today?

20      A.   I'm not sure.

21      Q.   Was he ever reassigned to a different position

22  after being reassigned to the Office of Language

23  Acquisition?

24      A.   I'm not sure.

25      Q.   Whose decision was it to reassign him?

```
 1        A.    That decision would be made with his direct

 2   supervisor, Dr. Sofia Freire.

 3        Q.    So it's solely her decision, or whose

 4   decision -- who else was involved?

 5        A.    The supervisors make the decision, and I am made

 6   aware of them.

 7        Q.    So it was Ms. Freire's decision?

 8        A.    Typically, it is.  Specifically for

 9   Dr. Ferguson, I don't know.

10        Q.    So you don't know who made the decision to

11   reassign him from principal?

12        A.    That's an assumption that he was reassigned from

13   principal.  I believe that's what happened, is what I

14   told you.  I don't know specifically the details of that.

15        Q.    Were you involved in the decision to reassign

16   Dr. Ferguson?

17        A.    As being informed by his supervisor, I'm

18   typically aware, yes.  I don't remember specifically if I

19   was on this one.

20        Q.    Okay.  I understand that you're made aware, but

21   were you involved in helping to make the decision --

22        A.    No.

23        Q.    -- to reassign him?

24        A.    No.

25        Q.    Do you recall if Dr. Ferguson was ever
```

```
 1   disciplined as a result of the ████████ complaint or

 2   investigations?

 3      A.   I don't remember.

 4           MR. RADI:   Just give me a couple minutes to

 5   consult with counsel.

 6           (Recess taken at 11:30 a.m. to 11:35 a.m.)

 7           MR. RADI:   I have no further questions for the

 8   witness.  The deposition is closed, subject to Court's

 9   ruling on certain questions the witness was directed not

10   to answer, should I decide to follow up with motion on

11   those issues.

12           MR. SULLIVAN:   Okay.  And we'll agree to the

13   same stipulation that we had with the other witnesses.

14           MR. RADI:   Will you just make me a copy of that?

15           MR. SULLIVAN:   Sure.

16           THE REPORTER:   So stipulated?

17           MR. RADI:   Yes.  Thank you.

18           THE REPORTER:   Mr. Sullivan, you need the same,

19   copies on the transcripts?

20           MR. SULLIVAN:   Yes, the same.  Thank you.

21                           -  -  -

22           (Stipulation from deposition of Andra Donovan

23           taken August 16, 2016, as follows:

24           "MR. SULLIVAN:   The original transcript

25        will be sent to our offices.  We'll provide any
```

1      corrections or changes within 30 days of the

2      posting of the transcript to our office.  We'll

3      maintain the original and make it available.  If

4      for any reason the original is lost, stolen, or

5      otherwise unavailable, a certified copy can be

6      used for all purposes.

7          "I don't think we put that in our stip

8      yesterday, but we can add that that is also a

9      stipulation to Mr. Gurrieri's deposition

10     transcript.

11         "MR. RADI:  That's fine.

12         "MR. SULLIVAN:  And we'll relieve the court

13     reporter of any duties she may have to maintain

14     the original.

15         "MR. RADI:  Agreed.")

16                    -  -  -

17         (TIME NOTED:  11:35 A.M.)

18                    -  -  -

19

20

21

22

23

24

25

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3          I, CINDY MARTEN, the witness herein, declare

 4    under penalty of perjury that I have read the foregoing in

 5    its entirety; and that the testimony contained herein is a

 6    true and accurate transcription of my testimony elicited

 7    at said time and place.

 8

 9          Executed this _____ day of _____, _____,
                                        (Month)      (Year)
10    at _____, _____.
11            (City)                (State)

12

13

14

15          _____

16          CINDY MARTEN

17

18

19

20

21

22

23

24

25
```

1    I, Antonia Sueoka, Certified Shorthand Reporter

2   licensed in the State of California, License No. 9007,

3   hereby certify that the deponent was by me first duly

4   sworn and the foregoing testimony was reported by me and

5   was thereafter transcribed with Computer-Aided

6   Transcription; that the foregoing is a full, complete,

7   and true record of said proceeding.

8    I further certify that I am not of counsel or

9   attorney for either or any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12    The dismantling, unsealing, or unbinding of the

13   original transcript will render the reporter's

14   certificates null and void.

15    In witness whereof, I have hereunto set my hand

16   this 30th day of August, 2016.

17    __X__ Reading and Signing was requested.

18    _____ Reading and Signing was waived.

19    _____ Reading and Signing was not requested.

20

21

22

23   _____

24   **Antonia Sueoka, RPR, CSR NO. 9007**

25

1            DECLARATION UNDER PENALTY OF PERJURY

2

3            I, CINDY MARTEN, the witness herein, declare

4    under penalty of perjury that I have read the foregoing in

5    its entirety; and that the testimony contained herein is a

6    true and accurate transcription of my testimony elicited

7    at said time and place.

8

9            Executed this 21 day of October , 2016 ,
                                              (Month)        (Year)

10   at    San Diego       ,        CA        .
                (City)              (State)

11

12

13

14

15            Cindy Marten

16   CINDY MARTEN

17

18

19

20

21

22

23

24

25

## INSTRUCTIONS FOR READING/CORRECTING YOUR DEPOSITION

To assist you in making corrections to your deposition testimony, please follow the directions below.  If additional pages are necessary, please furnish them and attach the pages to the back of the errata sheet.

This is the final version of your deposition transcript.

Please read it carefully. If you find any errors or changes you wish to make, insert the corrections on the errata sheet beside the page and line numbers.

Do NOT change any of the questions.

After completing your review, please sign the last page of the errata sheet, above the designated "Signature" line and return the transcript to your attorney.

### ERRATA SHEET

Witness: Cindy Marten                                    Taken On:  08-18-16

Page   Line

7    1    Change: Insert "you" between 'have' and 'been'
          Reason: Correction

56   14   Change: Change "conduct" to "contact"
          Reason: Correction

62   17   Change: "Indirectly" to "directly"
          Reason: Correction

70   7    Change: "Charged" to "charges"
          Reason: _____

___  ___  Change: _____
          Reason: _____

___  ___  Change: _____
          Reason: _____

___  ___  Change: _____
          Reason: _____

Page    Line

_____  _____        Change:_____

                        Reason:_____

_____  _____        Change:_____

                        Reason:_____

_____  _____        Change:_____

                        Reason:_____

_____  _____        Change:_____

                        Reason:_____

_____  _____        Change:_____

                        Reason:_____

_____  _____        Change:_____

                        Reason:_____

_____  _____        Change:_____

                        Reason:_____

_____ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made.  I certify that the transcript is true and correct.


_____ _Cindy Marten_____        ___10-21-16___
(signature)                                      (date)